# United States Court of Appeals
# For the First Circuit

No. 23-1657

NORTHWESTERN SELECTA, INC.,

Plaintiff – Appellee,

v.

RAMÓN GONZÁLEZ-BEIRÓ, Secretary of the Puerto Rico Department of Agriculure; ALEX MUÑIZ-LASALLE, Deputy Secretary of the Puerto Rico Department of Agriculure,

Defendants – Appellants.

APPEAL FROM JUNE 28, 2023 JUDGMENT AND OPINION AND ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO

## APPELLANTS' BRIEF

s/Edward W. Hill Tollinche
*273 Sierra Morena* PMB 248
*San Juan, PR 00926*
Tel.: (787) 294-0044
ehill@hillgonzalezlaw.com
USCA No.: 68,363

## CORPORATE DISCLOSURE STATEMENT

Fed. R. App. P. 26.1 does not require a corporate disclosure statement because the appellants are a Puerto Rico Government regulatory agency known as the Department of Agriculture of Puerto Rico, the Secretary and the Deputy Secretary of the Department, in their official capacities.

# TABLE OF CONTENTS

**PAGES**

I      JURISDICTIONAL STATEMENT …….…………..…....…      1

II      STATEMENT OF ISSUES FOR REVIEW ……………...…..      2

III      STATEMENT OF THE CASE ………………….…………..…      2

      A.  *Introduction*……………………………………………….      2

      B.  *Northwestern operates an Official Establishment under the PPIA*……………………………………………….      2

      C.  *Puerto Rico's regulatory background*………………….      4

      D.  *Administrative enforcement proceedings for violations of Article XII(B)*……………………………………………….      4

      E.  *Northwestern challenged Article XII(B) in the District Court*……………………………………………….      7

IV      STANDARD OF REVIEW      9

V      SUMMARY OF THE ARGUMENT      9

VI      ARGUMENTS …………………………………………….………      10

      A.  *General principles of statutory interpretation*…………....      10

      B.  *Interpretation of preemption statutes*………………….      11

      C.  *The meaning of the words of the PPIA's preemption statute*……………………………………………….      12

            1.  *The ordinary meaning of "premises, facilities, and operations*……………………………………….      13

2. *The context of "premises, facilities and operations*……………………………………………..    14

3. *The use of "premises, facilities and operations" in the regulations*…………………………..……..    16

4. *The use of "premises, facilities and operations" in related regulations*………………..………….    18

D. *The Congressional intent of the PPIA*……………..………    19

E. *Judicial construction of "premises, equipment and operation*……………………………………………….    21

F. *Intermodal freight Containers cannot be considered inside Northwestern 's premises, facilities or establishment to eschew local authority's inspection*……………    27

VII    CONCLUSION ………………………………………….    30

# INDEX OF AUTHORITIES

**PAGES**

I.     <u>United States Legislation and Rules</u>

Poultry Products Inspection Act's (the PPIA) 21 U.S.C…………...…    3,13-16,20-21,30

28 U.S.C. Sec…..……………………………………………..…….    1

Code of Federal Regulation (C.F.R); Poultry Products Inspection Regulations" (9 C.F.R.)(PPIR)……………………………………….    16-19,26

U.S. Constitution, Art. VI, Cl. 2……………………………………...    11

II.     United States Supreme Court

*Babb v. Wilkie*, 140 S. Ct. 1168, 1172 (2020)……………………………    11

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U. S. 246, 252 (2004)………………………………………………………………    11

*National Meat Association v. Harris*, 565 U.S. 452 (2012)…………...….    22,23

*Van Buren v. United States*, 141 S. Ct. 1648, 1654 (2021)………………    11

III.     First Circuit and Other Courts of Appeals

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F. 3d 1140, 1146 (9th Cir. 2017)…………………………………………..    12,20

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Bonta*, 33 F. 4th 1107, 1113 (9th Cir. 2022)………………………………………………...    12,20

*Baker v. Smith & Wesson, Inc*., 40 F.4th 43, 48 (1st Cir. 2022)………..    11

*Chicago-Midwest Meat Association v. Evanston*, 589 F. 2d 278 (7th Cir. 1978)……………………………………………………………….    24

*Cohen v. ConAgra Brands, Inc*., 16 F. 4th 1283, 1287 (9th Cir. 2021)... 9

*Consumer Data Industry Association*, 26 F. 4th 1, 5 (1st Cir. 2022)…... 11

*Domegan v. Fair*, 859 F. 2d 1059, 1064 (1st Cir. 1988)……………….. 16

*Evans v. Commissioner*, 933 F. 2d 1, 7 (1st Cir. 1991)………………... 16

*Garcia-Rubiera v. Calderon*, 570 F.3d 443, 455-56 (1st Cir. 2009)…... 9

*Penobscot Nation v. Frey*, 3 F.4th 484, 490 (1st Cir. 2021)…………… 11

*In re extradition of Howard*, 996 F.2d 1320, 1327 (1st Cir. 1993)……... 9

*Mississippi Poultry Ass'n v. Madigan*, 31 F. 3d 293, 295 (5th Cir. 1994)………………………………………………………………… 20,21

*National Broiler Council v. Voss*, 44 F. 3d 740, 743 (9th Cir. 1994), fn. 2………………………………………………………………… 12

*Ryan v. U.S. Immigration and Customs Enforcement*, 974 F.3d 9, 19 (1st Cir. 2020)…………………………………………………….. 11

*U.S. v. Winczuk*, 67 F. 4th 11, 16 (1st Cir. 2023)……………………… 13,14,22

*Woo v. Spackman*, 988 F.3d 47, 50-51 (1st Cir. 2021)………………… 10

   IV.    U.S. District Courts

*Johnson v. Tyson Foods, Inc*., 2021 U.S. Dist. LEXIS 212486; 2021 WL 5107723 (W.D. Tenn. 2021)……………………………………. 26

   V.    Puerto Rico Legislation

Market Regulation No. 8 – To Govern the Quality and the Marketing of Poultry Meat in the Commonwealth of Puerto Rico. (Regulation 8764 of June 24, 2016)……………………………………….………. 4,9,10

## APPELLANTS' BRIEF

**TO THE HONORABLE COURT:**

**COME NOW** Appellants the Department of Agriculture of Puerto Rico, Ramón González Beiró, in his official capacity as the Secretary of the Department of Agriculture and Alex Muñiz LaSalle, in his official capacity as the Deputy Secretary of the Department of Agriculture, and respectfully submit their brief in this Appeal taken from the Judgment granting a permanent injunction over the application of certain Puerto Rico regulations to Northwestern Selecta, Inc. (Northwestern), dated June 28, 2023 issued by the United States District Court for the District of Puerto Rico (the District Court).

## I.   JURISDICTIONAL STATEMENT

The United States Court of Appeals for the First Circuit has appellate jurisdiction to hear and decide this appeal under 28 U.S.C. §1291.  The appeal is taken from the Judgment issued by the United States District Court dated June 28, 2023 in the case captioned *Northwestern Selecta, Inc., v. Secretary of the Department of Agriculture of Puerto Rico, et al,* Civil No. 22-1092, before the Honorable Judge Raúl M. Arias-Marxuach (*Addendum*, p. 25).  The Judgment permanently enjoins the Appellants from enforcing Article XII(B) of Market Regulation Number 8 (MR8) against Northwestern which requires an inspector to be present when an intermodal freight container is first opened prior to being

unloaded at Northwestern's (or other distributor's) facilities in Puerto Rico, and from detaining product or imposing regulatory penalties against infractions thereof. On July 26, 2023, the Appellants filed their timely Notice of Appeal. (*Addendum*, p. 27).

## II.    STATEMENT OF ISSUES FOR REVIEW

Appellants respectfully presents the following issue on appeal:

Does the scope of the Poultry Products Inspection Act's (the PPIA) preemption statute include Puerto Rico's requirement for a state officer to be present when an intermodal freight container is first opened upon arrival from elsewhere to Northwestern's official establishment prior to its cargo being unloaded into its facilities? Appellants' response, as will be argued herein, is that this local regulatory requirement is outside of the scope of the preemption statute.

## III.    STATEMENT OF THE CASE

*A.    Introduction*.    The operative facts of the case were stipulated by the parties. Ap. p.137. Their submissions to the District Court argued the law related to the PPIA and its preemption statute as applied to the stipulated facts which are relatively straightforward. This case only involves a legal issue.

*B.    Northwestern operates an Official Establishment under the PPIA*. Northwestern's facilities are located in San Juan, Puerto Rico and "are certified as an 'official establishment' by the United States Department of Agriculture." Ap.

p.140. Northwestern "imports fresh and frozen poultry products domestically from within the United States, as well as frozen poultry products from foreign countries." Ap. p.140. The poultry products it distributes in Puerto Rico arrives on the Island by ship in intermodal freight containers[1], which are off-loaded from the ship to a trailer, and hauled by truck to its facilities. "Most [Northwestern's] [intermodal freight] containers containing poultry products also contain other food products." Ap. p.140. Northwestern's operations are not related to slaughter or processing, core operations considered in the PPIA, and thus it is "not the kind of establishment[] that Congress sought to regulate most directly."Ap. p.579. "All importers, including [Northwestern], provide copies of bills of ladings and inform[] the Puerto Rico Department of Agriculture ("PRDA") of the contents of the [intermodal freight] containers that arrive to the Port of San Juan. The bills of lading do not inform the PRDA of product conditions upon arrival. Only a visual inspection of the product shows the product condition upon arrival. All poultry products that [Northwestern] imports from within the U.S. have already been inspected and passed on the

---

[1] Appellants use the term "intermodal freight containers" throughout the brief because that is the delivery vehicle utilized for the processed and packaged poultry products to reach Puerto Rico. These are standardized shipping containers made of steel and are rectangular in shape measuring between 20 and 45 feet. These are the type of containers to which the Puerto Rico regulations refer. The PPIA defines terms such as container, shipping container and immediate container (21 U.S.C. Sec. 453(r), (t) and (u). These are not at issue here.

mainland by the U.S. Department of Agriculture ("USDA") and bear an official mark to that effect."  Ap. p.140.

   C.    *Puerto Rico's regulatory background.*  MR8 was enacted by the PRDA to "Govern the Quality and the Marketing of Poultry Meat in the Commonwealth of Puerto Rico."  Article XII(B) requires that "[a]n official of the Department [of Agriculture] must be present at the time of opening and unloading the [intermodal freight] container."  Ap. p.078.  "Prior to June 2021, [Appellants] had not enforced nor sought to enforce Article XII(B) against [Northwestern]."  Ap. p.141.  Noncompliance with the regulation carries administrative fines.

   D.    *Administrative enforcement proceedings for violations of Article XII(B)*.  "On June 30, 2021, [Appellant Alex Muñiz, in his official capacity as] Deputy Secretary, through [Department of Agriculture] inspectors, [ ] issued several Orders of Detention, impounding over two hundred thousand (200,000) pounds of fresh poultry products imported by [Northwestern] from within the United States. The grounds for the Orders of Detention were that a [Department of Agriculture] inspector was not physically present when the [intermodal freight] container containing the products was opened and unloaded at the [Northwestern] facilities, asserting a violation of Article XII(B) of [MR8]."  Ap. p.141. "Since June 2021 and through the day of th[e] stipulation, the [Department of Agriculture's] Deputy Secretary has: (a) issued Notices of Violation against [Northwestern] with respect to

thirty-five (35) [intermodal freight] containers containing poultry products imported from within the U.S. that have been opened and unloaded at the [Northwestern] Facilities without the presence of a [Department of Agriculture] inspector, and (b) asserted the right to impose fines of approximately $263,000 against [Northwestern]." Ap. p.141. All detained poultry products were ultimately released for distribution and sale. Ap. p.141.

"The Deputy Secretary refused to rescind the Notices of Violation and continues to assert the right not to allow [Northwestern] to open and unload [intermodal freight] containers containing poultry products imported from within the U.S at the [Northwestern] facilities without the presence of a [Department of Agriculture] inspector. Ap. p.141. "The USDA and the Food Inspection and Safety Service ("FSIS") do not require that a USDA-FSIS inspector be present when [Northwestern] opens and unloads [intermodal freight] containers containing poultry products imported from within the U.S at the [Northwestern] facilities." Ap. p.141.

"On June 30, 2021, [a Department of Agriculture inspector by the name of] Agronomist Jaime Traverso visited [Northwestern's] facilities located in San Juan, Puerto Rico. At the moment of the visit, the [intermodal freight] containers subject to inspection had been opened and its contents unloaded. The [Department of Agriculture] issued Detention Orders 10395, 10396, 10397, 10398, 10399 and 10400." Ap. p.141. "On June 30, 2021, [Appellant] Alex Muñiz, acting [in his

official capacity] as Deputy Secretary [ ], notified [Northwestern] that it had violated [MR8], and its intent to fine [Northwestern] with $500.00 fines for each violation." Ap. p.141. "On July 1, 2021, the PRDA rescinded the detention orders. The detained product entered commerce." Ap. p.141.

On July 20, 2021, [Northwestern] filed a motion to reconsider with the [Department of Agriculture] where it argued, among other grounds that [MR8] was preempted by Federal Law and regulations." Ap. p.141. "On August 19, 2021, the [Department of Agriculture] vacated without prejudice the notices of violations." Ap. p.141. On August 30, 2021, the [Department of Agriculture] issued a notice of violation and an order to [Northwestern] to show cause why it should not be held in violation of [MR8]." Ap. p.141. "On September 14, 2021, Northwestern filed its motion showing cause where it argued, among other grounds, that MR8 was preempted by Federal Law and regulations." Ap. p.142. "On October 14, 2021, the [Department of Agriculture] issued a resolution and order that denied the motion showing cause and imposed the fines for each violation to [MR8]." Ap. p.142.

"On November 15, 2021, [Northwestern] filed a document entitled [Motion for Reconsideration] with respect to the October 14, 2021 resolution and order, reiterating that the fines were preempted by federal law." Ap. p.142. The foregoing filing was given the procedural treatment of an administrative complaint with Northwestern as the complainant and the Department of Agriculture as the

respondent. "On January 10, 2022, the [Department of Agriculture] filed its answer to the administrative complaint. In it, [Department of Agriculture] asserted, among other things, that the administrative forum was "not the adequate forum" to resolve Northwestern's claims of federal preemption." Ap. p.142.

"On January 20, 2022, the [Department of Agriculture's] examining officer issued an order scheduling an initial scheduling conference for February 2, 2022." Ap. p.142. "On February 2, 2022, an initial scheduling hearing was held." Ap. p.142. The proceedings of the administrative complaint were stayed by agreement between counsel in order to focus on the federal complaint.

E.    *Northwestern challenged Article XII(B) in the District Court.* On February 24, 2022, Northwestern filed a verified complaint seeking declaratory and injunctive relief asserting that the PPIA preempted, inter alia, MR8, Article XII(B). Ap. p.001. It also asserted that the regulation violated the commerce clause of the United States Constitution. The commerce clause issue was not briefed by the parties, nor decided by the District Court, thus it is not before this Court. After the issuance and service of summons and complaint, the District Court ordered the parties to appear for a status conference and to provide a series of proposed, rejected and accepted factual stipulations. Ap. p.122. In compliance with the District Court's order, the parties submitted a set of stipulations and a proposed briefing schedule. Ap. p.141. The District Court approved the proposed briefing schedule.

Northwestern filed its "Memorandum in Support of Request for Injunction" on March 25, 2022 (Ap. p.161), and Appellants filed their brief on April 8, 2022 (Ap. p.417)

The District Court issued its "Opinion and Order Regarding Permanent Injunction" (Ap. p.562) and its Judgment (Ap. p.586) on June 28, 2023, whereby it granted Northwestern's request and issued a permanent injunction against the enforcement of Article XII(B) against Northwestern.  The District Court reasoned that since Northwestern's "facilities are an official establishment that imports fresh and frozen poultry products domestically from within the United States, as well as frozen poultry products from foreign countries…the poultry products they import are necessarily *inside* an official establishment."  Ap. p.581.  "Accordingly, the PRDA lacks concurrent jurisdiction to impose inspection requirements with regards to these products and Article XII(B) is preempted."  Ap. p.582.  The District Court enjoined Appellants from "[e]nforcing Articles XII(B) and XIV(A)(6) of [MR8] against Northwestern; [e]nforcing or giving effect to Article XIV(A)(6) of [MR8] that imposes requirements with respect to marking, labeling, packaging, or ingredients that are in addition to, or different than those made under the PPIA; [e]nforcing or giving effect to Article XII(B) of [MR8] requiring that a PRDA inspector be physically present when shipping containers are opened and unloaded in official establishments; and [d]etaining imported poultry products or levying

sanctions (including suspension or revocation of any license issued by the Puerto Rico Department of Agriculture, or failure to renew the same) against Northwestern for failure to comply with Articles XII(B) and/or XIV(A)(6) of [MR8]." Ap. p.584-585. However, "[the] permanent injunction does not constitute a limitation on the PRDA's enforcement of [MR8] provisions that are identical to federal regulations." Ap. p.585.

## IV.   STANDARD OF REVIEW

This Court of Appeals reviews a district court's grant of a permanent injunction for abuse of discretion, reviewing its underlying conclusions of law de novo and any factual findings for clear error. *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 455-56 (1st Cir. 2009). Similarly, appeals involving pure questions of law are generally reviewed *de novo*. *In re extradition of Howard*, 996 F.2d 1320, 1327 (1st Cir. 1993) (citation omitted). Finally, "[q]uestions of preemption and statutory interpretation are also reviewed de novo." *Cohen v. ConAgra Brands, Inc*., 16 F. 4th 1283, 1287 (9th Cir. 2021).

## V.   SUMMARY OF THE ARGUMENT

Article XII(B) requires that "[a]n official of the Department [of Agriculture] must be present at the time of opening and unloading the [intermodal freight] container." Ap. p.078. The District Court opined that "Article XII(B) necessarily relates to [Northwestern's] operations, of which is inspection is an integral part."

Ap. p.580.  The District Court agreed with Plaintiff's assertion "that compliance with this regulation affects distribution operations by causing delays and decreasing the shelf-life of imports, particularly when the PRDA inspector is untimely or fails to arrive completely." *Id*.

The District Court construed the phrase "premises, facilities and operations" and even the word "operation" to include matters that are outside of the reach of the preemption statute's language and beyond the scope of congressional intent.  By doing so, the District Court's expansive reading of the preemption statute enlarged its reach and has encroached on those traditional police powers reserved to the states and territories.  Reversal of the judgment and vacation of the permanent injunction is warranted.

## VI.    ARGUMENT

*A.    General principles of statutory interpretation.*  This appeal involves conflicting interpretations of the scope of the PPIA's preemption statute.  To solve the conflict, it is settled that statutory construction "ought to start with the statutory text" being interpreted.  *Woo v. Spackman*, 988 F.3d 47, 50-51 (1st Cir. 2021).  According to the United States Supreme Court, "[s]tatutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs.*

*Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U. S. 246, 252 (2004)[2].  Similarly, this Court of Appeals has held that statutory interpretation "begins with text itself," *Penobscot Nation v. Frey*, 3 F.4th 484, 490 (1st Cir. 2021), and that it must "interpret [such] text in accordance with its ordinary, contemporary, and common meaning." *Baker v. Smith & Wesson, Inc.*, 40 F.4th 43, 48 (1st Cir. 2022)[3].

　　*B.*　　*Interpretation of preemption statutes*.　　The interpretation of a preemption statute is not dissimilar from the general rule of statutory interpretation.  It does, however, have nuances.  Of course, federal law is "the supreme Law of the Land." U.S. Constitution, Art. VI, Cl. 2.  Supremacy grants Congress "the power to preempt state law." *Consumer Data Industry Association*,  26 F. 4th 1, 5 (1st Cir. 2022) citing *Capron v. Off. of Att'y Gen. of Mass.*, 944 F. 3d 9, 21 (1st Cir. 2019).  This case involves "express preemption," which is that kind of preemption "when congressional intent to preempt state law is made explicit in the language of the federal statute." *Id.*, citing *Tobin v. Fed. Express Corp.,* 775 F. 3d 448, 452 (1st. 2014).   First

---

[2] *Van Buren v. United States*, 141 S. Ct. 1648, 1654 (2021) (in construing a statute "we start where we always do: with the text of the statute"); *Babb v. Wilkie*, 140 S. Ct. 1168, 1172 (2020) ("Which interpretation is correct? To decide, we start with the text of the statute.").

[3] *Ryan v. U.S. Immigration and Customs Enforcement*, 974 F.3d 9, 19 (1st Cir. 2020) ("[In] any effort to decipher the meaning of a federal statute, the touchstone of [the] inquiry is congressional intent [and] . . . the quest to determine [that] intent must start with the text of the statute itself.") (internal quotation marks and citation omitted).

Circuit precedent holds that in matters of express preemption, the Court "concentrate[s] on congressional intent [as a] [] 'touchstone' of any effort to map an express preemption clause." *Id*. "Where the federal statute contains an express preemption clause, [courts] must determine the substance and the scope of the clause. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F. 3d 1140, 1146 (9th Cir. 2017). The Court is "illuminate[d] [of] this intent [by] the text and context of the provision itself," and its "analysis is informed by the statutory structure, purpose, and history." *Tobin v. Fed. Express Corp*. 775 F. 3d 448, 452-452 (1st Cir. 2014). It is generally assumed that "the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F. 3d at 1146. Further, if "the text of the pre-emption clause is susceptible to more than one plausible reading, courts ordinarily 'accept the reading that disfavors preemption." *Id*. Express preemption provisions are interpreted narrowly. *National Broiler Council v. Voss*, 44 F. 3d 740, 743 (9th Cir. 1994), fn. 2.

C.  <u>*The meaning of the words of the PPIA's preemption statute.*</u>  "Express preemption arises 'when the text of a federal statute explicitly manifests Congress's intent to displace state law." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Bonta*, 33 F. 4th 1107, 1113 (9th Cir. 2022). Because this case involves an express preemption statute, "[w]e begin…with the text of the statute." *U.S. v. Winczuk*, 67

12

F. 4th 11, 16 (1st Cir. 2023).

The PPIA provides that the "[r]equirements within the scope of this chapter with respect to premises, facilities and operations [and] [m]arking, labeling, packaging, or ingredient requirements…in addition to, or different than, those made under this chapter may not be imposed by any State or Territory or the District of Columbia with respect to articles prepared at any official establishment in accordance with the requirements under this chapter…".  21 U.S.C. Sec. 467(e) (underline added).  The PPIA does not provide a definition for premises, facilities and operations.  21 U.S.C. Sec. 453.  The District Court interpreted that the Puerto Rico regulatory requirement for an inspector to be physically present before opening an intermodal freight container containing poultry products is preempted by the PPIA because Puerto Rico regulations are "in addition" or "different than" the PPIA's regulations of Northwestern 's official establishment's "premises, facilities and operation".  Appellants consider that the local regulatory requirement is beyond the statute's preemptive framework, and as such within the traditional police powers of Puerto Rico.

1.    The ordinary meaning of "premises, facilities, and operations."  In order to determine whether the state regulatory requirement is preempted by the PPIA, the preemptive framework must be traced.  Congress' choice of words in the text of Section 467(e) are "premises, facilities and operations."  Merriam-Websters dictionary defines "premises" as "a tract of land with the buildings thereon" or "a building

or part of a building usually with its appurtenances (such as grounds)." According to the same source, "facilities" is something (such as a hospital) that is built, installed, or established to serve a particular purpose." And it defines "operations" as the "performance of a practical work or of something involving the practical application of principles or processes." Thus, from the ordinary meaning of the words of the text, a state or territory could not regulate things in addition to or different than those things regulated regarding Northwestern's buildings and facilities where it performs its practical work. To hone in on this, a state could not regulate things in addition to or different than what the law or its regulations provide for those processes that are regulated by it such as "the inspection of the slaughter of poultry, or the processing of poultry products" the official establishment "maintain[s] under the authority of th[e] Act." 21 U.S.C. Sec. 453(p).

2.    <u>The context of "premises, facilities and operations.</u>" Although the PPIA does not provide an explicit definition to the words "premises, facilities and operations," their meaning can be gleaned from the context of the Act. *U.S. v. Winczuck*, 67 F. 4th at 17 ("It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") For instance, in Section 453(p), an official establishment is one where "inspection of the slaughter of poultry" and the "processing of poultry prod-

ucts" takes place. 21 U.S.C. Sec. 453(p).  In Section 456 "[e]ach official establishment slaughtering poultry or processing poultry products for commerce or otherwise subject to inspection under this Act shall have such premises, facilities, and equipment, and be operated in accordance with such sanitary practices, as are required by regulations promulgated by the Secretary for the purpose of preventing the entry into or flow or movement in commerce or burdensome effect upon commerce of poultry products which are adulterated." 21 U.S.C. Sec. 456.  Both Sections clearly refer to the actions, processes and practices that happen within the official establishment relative to the slaughter and processing of poultry, and poultry products.  The official establishment must comply with the Secretary's regulations regarding sanitary practices to assure unadulterated food reaches the consumer.  Contextually, the Act regulates matters involving the use of the premises, facilities, equipment and operations in relation to poultry slaughter and processing.  It would follow that the preemption statute would preclude states to "add" to the regulations, or make different regulatory requirements than those already made by the federal government.  But, the Act does not regulate matters occurring outside of the official establishment that do not implicate the slaughter or processing poultry or poultry products, as would be the requirement of opening a marine cargo container in the presence of a government official contemporaneously to its arrival to its facilities.  Such a requirement is outside the PPIA's statutory framework, and thus not preempted.

3.   <u>The use of "premises, facilities and operations" in the regulations</u>.

Moreover, an understanding of what premises, facilities, equipment and operations mean may also be derived from the "Poultry Products Inspection Regulations" (9 C.F.R. Sec. 381)(PPIR)[4]. *Evans v. Commissioner,* 933 F. 2d 1, 7 (1st Cir. 1991) ("[T]he Supreme Court has said that where a regulatory statute is ambiguous, [courts] are to give considerable weight to the views of the agency charged with the statute's administration."); *Domegan v. Fair*, 859 F. 2d 1059, 1064 (1st Cir. 1988)("[I]f the officials had any doubt concerning the statute's meaning, they need only have consulted the relevant regulations.  Had they done so, the requirements…would have been apparent to them.").  The PPIR defines "process…as a verb [that] means to conduct any operation or combination of operations, whereby poultry is slaughtered, eviscerated, canned, salted, stuffed, rendered, boned, cut up or otherwise manufactured or processed." 9 C.F.R. 381.1.  Obviously, the processes that are regulated by the PPIR are part of the operations of the official establishment in its meat processing.  PPIR also provides the details for the inspection facilities required in the official establishment, and the schedule of operations.  9 C.F.R. Subpart G, Secs. 381.36-381-39.  The regulations go into great detail for the ante and

---

[4] The U.S. Secretary of Agriculture was delegated the power to enact regulations that "prescribe conditions under which poultry products capable of use as human food, shall be stored or otherwise handled by any person engaged in the business of buying, selling, freezing, storing or transporting, in or for commerce…and such other rules and regulations as are necessary o carry out the provisions of" the PPIA. 21 U.S.C. Sec. 463(a) and 463(b).

post mortem inspection requirements by federal inspectors of slaughtered and/or processed poultry.  9 C.F.R. Subparts J and K, Secs. 381.70-381.94.

As for operating procedures, federal regulations have requirements related to "processing…handling , [] storing …poultry product[s]" (9 CFR Sec. 381.65(a)), "slaughter[ing] in accordance to good commercial practices" (9 CFR Sec. 381.65(b)), thawing practices (9 CFR Sec. 381.65(c)), use of wash water (9 CFR Sec. 381.65(d)), control of fecal contamination (9 CFR Sec. 381.65(e)), control of contamination throughout the slaughter and dressing of poultry, chilling and freezing procedures, use of ice and water, inspection rates, slaughter line speed rates and the like.

According to the preemption statute's scope, states cannot make laws or regulations that were in addition to or different than these regulatory requirements that implicate the premises, facilities and operations in relation to poultry slaughter and processing.  But, requiring a state officer to be present when an intermodal freight container that has arrived to Puerto Rico from elsewhere is opened does not interfere with Northwestern's federally regulated operations.  It does not add or is different from them because the requirement is outside of the preemption framework.

The statute also provides that "[] storage or handling requirements found by the Secretary to unduly interfere with the free flow of poultry products in commerce [] in addition to, or different than, those made under this chapter may not be imposed

by any State or Territory or the District of Columbia with respect to articles prepared at any official establishment in accordance with the requirements under this chapter…". 21 USC Sec. 467e. The U.S. Secretary of Agriculture, nor the USDA, has not "found" generally through regulation, or specifically in an opinion, or decision, that the local requirement for intermodal freight containers to be opened in the presence of a government officer "unduly interferes with the free flow of poultry products." Also of note is the USDA's absence from the case[5].

    *4.*    *The use of "premises, facilities and operations" in related regulations.*

Other applicable regulations such as the "Regulatory Requirements under the Federal Meat Inspection Act, the Poultry Inspection Act and the Egg Products Inspection Act" provide additional insights into the meaning of premises, facilities, equipment and operations of an official establishment, which "must be operated and maintained in a manner sufficient to prevent the creation of insanitary conditions and to ensure that product is not adulterated." 9 C.F.R. Sec. 416.1. Regulatory requirements provide the details surrounding pest control, construction of the establishment, lighting, ventilation, plumbing, sewage and water supplies. 9 C.F.R. Sec. 416.2. Similarly, the regulations provide for the type of equipment and utensils used in the establishments (9 C.F.R. Sec. 416.3), the sanitation of such equipment and utensils (9 C.F.R.

---

[5] *Northwestern Selecta, Inc., v. Muñoz*, 106 F. Supp. 2d 223, 224-225 (D.PR 2000), where the USDA filed an Amicus Curie brief in support of preemption to PR's labeling requirement.

Sec. 416.4), and employee hygiene (9 C.F.R. Sec. 416.5).

The ordinary meaning of the words "premises, facilities and operations" as used in the PPIA and PPIR indicate things and activities within the official establishment that relate to the slaughter and processing of poultry and poultry products. A narrow construction of the words and phrase "premises, facilities and operations" necessitates the conclusion that requiring the presence of a state official when an intermodal freight container that contains previously processed and packaged poultry is opened upon arrival to its Puerto Rico facilities is outside of the preemptive framework. The requirement neither adds to or differs from the federally regulated activities related to the slaughter, processing, handling and packaging of poultry and poultry products.

    *D.*    *The Congressional intent of the PPIA.*   Section 452 expresses that it is Congress's intent through the PPIA "to provide for the inspection of poultry and poultry products and otherwise regulate the processing and distribution of such articles as hereinafter prescribed to prevent the movement or sale in interstate or foreign commerce of, or the burdening of such commerce by, poultry products which are adulterated or misbranded…[and]….that when poultry and poultry products are condemned because of disease, the reason for condemnation in such instances shall be supported by scientific fact, information, or criteria, and such condemnation under

this Act shall be achieved through uniform inspection standards and uniform applications thereof." 21 U.S.C. Sec. 452.

Courts have explained that "Congress enacted the PPIA, thereby establishing a comprehensive federal program for the regulation of poultry products…to serve a two-fold purpose: To protect consumers from misbranded, unwholesome, or adulterated products, and to protect the domestic poultry market from unfair competition." *Mississippi Poultry Ass'n v. Madigan*, 31 F. 3d 293, 295 (5th Cir. 1994). "The PPIA created one uniform regulatory scheme for the national market." *Id*. at 296. The "PPIA was intended to ensure that the nation's poultry products 'are wholesome, not adulterated, and properly marked, labeled, and packaged'." *Ass'n des Elevurers de Canards et d'Oies du Quebec v. Bonta*, 33 F. 4th at 1114; *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F. 3d at 1144. "The PPIA accomplishes this goal by, inter alia, authorizing the inspection of slaughterhouses and poultry- processing plants, 21 U.S.C. § 455, setting proper sanitation requirements, id. § 456, authorizing the Secretary of the U.S. Department of Agriculture ("USDA") to establish labeling and container standards, id. § 457, prohibiting the sale of adulterated, misbranded, or uninspected poultry products, id. § 458,

establishing record-keeping requirements, id. § 460, and instituting storage and handling regulations, id. § 463." *Id*. at 1144-1145[6].

Thus, the scope of the preemption statute is related to those matters regulated by the PPIA, that accomplish Congressional intent - things such as the regulation of the sanitation in the processing plants, their premises, the equipment used and the operations related to the slaughter and processing of poultry and poultry products, the storage facilities and handling of the processed poultry. It was not Congressionally intended that anything that could indirectly affect the operation of an official establishment be preempted. Puerto Rico's requirement that an intermodal freight container that contains previously slaughtered, processed and packaged poultry and poultry products to be opened when its officer is physically present when it arrives to Puerto Rico after its sea voyage is outside of Congress's intended preemptive framework.

E.    *Judicial construction of "premises, equipment and operation."* Most of the case law available involves Section 467(e)'s "[m]arking, labeling, packaging, or ingredient requirements…in addition to, or different than" language. Judicial

---

[6] *Mississippi Poultry Ass'n v. Madigan*, 31 F. 3d at 295, fn. 7 ("This federal regulatory scheme provides, inter alia, general standards regarding inspections and labeling of poultry products, and sanitation at production facilities. See 21 U.S.C. § 455 (inspection), § 456 (sanitation), & § 457 (labeling). It also contains a list of definitions and "prohibited acts," along with a detailed scheme for monitoring compliance. See 21 U.S.C. § 453 (definitions), § 458 (prohibited acts), and §§ 455-57, 460, 462, 467-70 (containing monitoring provisions).")

construction of "premises, equipment and operation" is sparce. This is not a case where the "phrase was judicially construed by every circuit which addressed the issue…". *U.S. v. Winczuk*, 67 F. 4th at 18. *In pari materia* canon of statutory construction might be appropriate in these circumstances. We turn to the Supreme Court's decision in *National Meat Association v. Harris*, 565 U.S. 452 (2012), where it had the opportunity to interpret the phrase "premises, facilities and operations" in the preemption statute of the Federal Meat Inspection Act, a federal statute with a similarly-worded preemption statute as the PPIA's. In that case, California criminalized the act of slaughterhouses buying, selling, receiving, processing, butchering, or even holding nonambulatory animals, and required the immediate euthanization of any such animal. The Court held that the California statute was preempted by the express preemption statute of the FMIA. It reasoned that "at every turn Section 599f imposes additional or different requirements on swine slaughterhouses: It compels them to deal with nonambulatory pigs on their premises in ways that the federal act and regulations do not…California's statute substitutes a new regulatory scheme for the one the FSIS uses…[w]here under federal law a slaughterhouse may take one course of action in handling a nonambulatory pig, under state law the slaughterhouse must take another." *Nat'l Meat Ass'n. v. Harris*, 565 U.S. at 460. The Court compared and contrasted the California and federal statutes on what the "slaughterhouse

[was] to do when…a pig becomes injured and nonambulatory." *Id*. While the California statute forbade the slaughterhouse from processing or even holding the animal, the federal statute permitted the processing and butchering if the federal inspector approved it. *Id*. Moreover, while the California law prohibited the receiving and buying a nonambulatory pig at time of delivery, the federal law permitted its purchase. *Id*. The Court reached the conclusion that the "sales ban [ ] functions as a command to slaughterhouses to structure their operations in the exact way the remainder of Section 599f mandates." *Id*. at 464. Because California's "sales ban regulates how slaughterhouses must deal with nonambulatory pigs on their premises…[t]he FMIA [] preempts it for all the same reasons." *Id*. The Court also contrasted statutes that banned the slaughter of horses for human consumption. "Unlike a horse slaughtering ban, the [California] statute reaches into the slaughterhouse's facilities and affects its daily activities." *Id*. at 467. "California's Section 599f endeavors to regulate the same thing, at the same time, in the same place except by imposing different requirements", and thus was preempted by the FMIA. *Id*. at 468.

The Supreme Court gave attention to the actions that were required under the California state law, the place those actions occurred and the manner in which the law affected the operations of the federally-regulated operations. The state statute essentially told the slaughterhouse what it could and could not do inside of its premises, facilities and in its operation. In contrast, MR8 requires Northwestern to do

nothing additional to or different from that which is federally regulated.  The Puerto Rico requirement of having a government official present upon opening an intermodal freight container upon arrival to its facilities in Puerto Rico from elsewhere has no direct effect on the operations of Northwestern within the meaning of the PPIA/PPIR, nor does it contradict federal law or regulation.  The requirement does nothing to affect the inner workings of the establishment.  It does not regulate what meat it can or cannot process, nor what meat it can and cannot receive.  It does not regulate how to slaughter, process, handle or market the meat.  It does not regulate the conditions under which it can process, receive, handle, package or market meat. It certainly does not "reach into" Northwestern's facilities, nor "affects its daily activities" that are regulated by federal statute or regulation.  MR8 does not require the implementation of anything different than PPIA/PPIR require for operation of its facilities.  MR8 only mandates Northwestern to coordinate with and wait for a state officer to arrive for the intermodal freight container to be opened and allow the officer to inspect the cargo and its conditions upon arrival.

*Chicago-Midwest Meat Association v. Evanston*, 589 F. 2d 278 (7th Cir. 1978) is illustrative to the meaning of "premises, facilities and operations."  The plaintiff association challenged municipal ordinances that authorized the inspection of meat delivery vehicles based on the Wholesome Meat Act's similarly-worded preemption

statute. The plaintiff association asserted that "the local ordinances under attack…provide[d] for inspection of meat delivery vehicles either while on their delivery routes or while unloading at the point of delivery must fall because they are 'in addition to, or different' from the inspection requirement of the [Wholesome Meat Act]." The Seventh Circuit disagreed and affirmed the district court's denial of preliminary injunction. The Court of Appeals reasoned that the "vehicle inspections at issue in this case, of course, occur beyond the premises of the association's members." *Chicago-Midwest Meat Association*, 589 F. 2d at 283. It turned to the legislative history and found that although "Section 408 would exclude States, territories and the District of Columbia from regulating Operations at plants inspected under [the Act, it] would permit them to impose…requirements consistent with Federal provisions as to other matters regulated under the act." *Id*. Thus, "the states may regulate meat delivery vehicles not on the premises of the regulated establishment so long as the state law is not inconsistent with the Act…". *Id*.

Similarly, MR8 does not regulate the "at the plant" premises, facilities and operations" when it requires that a state officer be present when an intermodal freight container is first opened. It was stipulated that bills of lading cannot reveal the conditions of the poultry when it arrives to Puerto Rico after its sea voyage, nor the other contents of the intermodal freight container. This local requirement is outside of the scope of the preemption statute.

The District Court below considered that even "remote regulations [that] affect operations" are preempted by the PPIA. Ap. p.580. The District Court relied on *Johnson v. Tyson Foods, Inc*., 2021 U.S. Dist. LEXIS 212486; 2021 WL 5107723 (W.D. Tenn. 2021). In that case, a Tyson Food employee sued her employer in state court for discrimination in relation to the employer's internal health policy that required all employees to be vaccinated with a Covid-19 vaccine. The case was removed from state court to federal court based on federal officer jurisdiction. The employee moved for remand, which was denied by the district court. In relation to the "colorable federal defense" removal predicate, the district court held that the employer's "vaccination policy relates to its premises, facilities and operations by ensuring that its employees are protected from COVID-19 infection [and] accordingly Plaintiff's claims fall within the scope of the PPIA." *Johnson v. Tyson Foods, Inc*., 2021 U.S. Dist. LEXIS 212486 *18. At least two things distinguish that case from this one. The first and most obvious is that Puerto Rico regulations at issue do not regulate the actions or health/sanitation requirements of employees while performing their duties on the premises, facilities and operations inside of the official establishment. The PPIA and the PPIR have employee program and sanitary regulations. 9 C.F.R. Secs. 381.32-45; 9 C.F.R. Sec. 416.5. The second is that Puerto Rico's requirement deals with the delivery vehicle that is outside of the premises,

26

facilities and operation of Northwestern's establishment.  This is an expansive inter-pretation of the preemptive framework, not a narrow one as judicially required.

Further, any effect of MR8 on the distribution operations of Northwestern is only incidental to its application. The regulation does not prescribe anything in ad-dition to or proscribe anything different than what is regulated under the PPIA/PPIR for Northwestern's operation.  Even the District Court noted that Northwestern's distribution operations are not related to slaughter or processing, and thus it is "not the kind of establishment[] that Congress sought to regulate most directly."  Ap. p.579.  Northwestern receives previously slaughtered, processed, packaged and la-beled poultry and poultry products, and distributes such on the Island.  The time it takes for an inspector to arrive to the place where the intermodal freight container is located and the delay caused to Northwestern's unloading and distribution endeavors are only indirect consequences of the regulation

F.    *Intermodal freight containers cannot be considered inside Northwest-ern's premises, facilities or establishment to eschew local authority's inspection.*

Finally, the District Court held that Puerto Rico cannot "exercise concurrent jurisdiction" under the PPIA with regards to inspection of items that are in the inter-modal freight containers because the poultry products are "inside an official estab-lishment."  Ap. p.581.  The District Court's reasoning is that the intermodal freight

container is a part of its official establishment.  No reading of the statute or the regulations supports the interpretation that the intermodal freight container is inside or part of Northwestern's official establishment when the truck delivers it to Appellee's site for offloading.  Again, *Chicago-Midwest Meat Association* is illustrative.  In that case, "the complaint allege[d] that the municipal officials conduct the inspections by stopping the vehicles while on their delivery routes or by examining them while the meat they carry is being unloaded at a point of delivery. These ordinances are invalid, the complaint asserts, because they are preempted by the Act."  *Chicago-Midwest Meat Association*, 589 F. 2d at 281.  The district court summarily dismissed the complaint because "no effective preemption claim [had] been stated because the ordinances here in question do not conflict with the quoted portions of the Act."  *Id*. The Court of Appeals affirmed, holding that "[t]he vehicle inspections at issue in this case, of course, occur beyond the premises of the association's members."  *Chicago-Midwest Meat Association*, 589 F. 2d at 283.  To consider, as the District Court here decided, that the intermodal freight containers were inside Northwestern's establishment, and as such can preemptively dodge MR8's requirement for a state officer to be present upon opening is similar to the rejected assertion made by the plaintiffs in *Chicago-Midwest Meat Association*, which considered the word "'operations' of regulated establishments [to] extend beyond their premises."  *Id*.  The

28

Seventh Circuit reasoned that "[w]hen we consider that word in the context of Section 408 we do not believe that Congress intended to give it such an expansive meaning." *Id*. A delivery vehicle that arrives from elsewhere to Northwestern's premises is not part of its premises, nor inside its establishment, for the purposes of the PPIA.

Northwestern's official establishment does not slaughter or process poultry. It only serves as a receiving hub from which it distributes packaged and labeled products. And, bills of lading alone do not demonstrate the conditions of the poultry products inside of the intermodal freight container upon arrival to Puerto Rico. As noted by the Seventh Circuit, "[i]nspection of meat delivery vehicles is a useful supplement to inspection of the meat they carry. Even if the vehicles are sanitary when they leave the regulated establishment, it is obvious that the meat they carry can become impure en route to the delivery point in a variety of ways." *Chicago-Midwest Meat Association*, 589 F. 2d at 284, footnote 8. This "obvious" fact is equally true when the intermodal freight container (the delivery vehicle) has travelled on the high seas, and which internal conditions cannot be assessed from a piece of paper prepared contemporaneous to its departure from the port.

It should be noted that "any State or Territory…may, consistent with the requirements under [the] [PPIA] exercise concurrent jurisdiction with the Secretary over articles required to be inspected under [the] [PPIA], for the purpose of prevent-

ing the distribution for human food purposes of any such articles which are adulterated or misbranded and are outside of such an establishment…".  21 U.S.C. Sec. 467(e).  It is impossible for Appellants to exercise concurrent jurisdiction to prevent the distribution of adulterated or misbranded poultry in Puerto Rico if a state officer is not present when an intermodal freight container is first opened before it is unloaded.  The intermodal freight container is outside of such establishment, and the requirement is a "useful supplement to inspection of the [poultry products]" these intermodal freight containers carry.

## VI.   CONCLUSION

The District Court's expansive reading of the PPIA's preemption statute is reversable error.  Read narrowly, as judicially required, the common and ordinary meaning of "premises, facilities and operations," the use of these words and phrases within the context of the legal and regulatory scheme in which they are utilized, the legislative intent and the judicial interpretation of the words and phrase reveal that Puerto Rico's regulatory requirement for a state officer to be present when an intermodal freight container is opened prior to unloading the poultry products shipped to Northwestern is outside of the PPIA's preemptive framework.  Appellants ask this Court of Appeals to reverse the District Court's judgment and vacate the permanent injunction.

Respectfully submitted,

<u>s/ Edward W. Hill</u>
Edward H. Hill
The Law Offices of Edward W. Hill
273 Sierra Morena PMB 248
San Juan, PR 00926
Telephone:  (787) 294-0044

October 24, 2023.

## STATEMENT OF RELATED CASES

Appellants hereby informs the Court of Appeals that there are no related cases pending resolution in other courts or agencies.

s/ Edward W. Hill

## STATEMENT OF INTERESTED PARTIES

Appellant does not know of an interested party that has not been informed and/or notified of this proceeding other than itself and Northwestern Selecta, both of which have appeared and/or will be notified of every filing before this Court through the CM/ECF system.

s/ Edward W. Hill

## CERTIFICATE OF COMPLIANCE

I certify that the attached brief is proportionately spaced, has a typeface of 14 points, and that it does not exceed of the thirty (30) pages.  This Brief contains 7,103 words, excluding the parts of specified in the Rules of Appellate Procedure.

In San Juan, Puerto Rico this 24th day of October, 2023.

s/ Edward W. Hill

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document has been electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record registered in the use of the CM/ECF system on this 24th day of October, 2023.  I further certify that this document has been served on Appellee's counsel by certified mail return receipt requested.

                s/ Edward W. Hill

## COUNSEL LISTING

On behalf of Appellant, counsel is as follows:

      Edward W. Hill-Tollinche, Esq.
      The Law Offices of Edward W. Hill
      273 Sierra Morena PMB 248
      San Juan, PR 00926
      Telephone:   (787) 294-0044
      ehill@hillgonzalezlaw.com

On behalf of Appellee, counsel is as follows:

      **MENDEZ LLC**
      Néstor M. Méndez Gómez
      USCA No.: 19557
      208 Ponce De León Ave., 18th Floor
      San Juan, PR 00918
      Tel: 787-505-0644
      E-mail: nmmendezgomez@gmail.com

      **PIETRANTONI MENDEZ & ALVAREZ, LLC**
      María Elena Martínez Casado
      USCA No.: 1189857
      208 Ponce De León Ave., 18th Floor
      San Juan, PR 00918
      Tel: 787-505-0644
      E-mail: mmartinez@pmalaw.com

# United States Court of Appeals
# For the First Circuit

_____

No. 23-1657

NORTHWESTERN SELECTA, INC.,

Plaintiff – Appellee,

v.

RAMÓN GONZÁLEZ-BEIRÓ, Secretary of the Puerto Rico Department of Agriculture; ALEX MUÑIZ-LASALLE, Deputy Secretary of the Puerto Rico Department of Agriculture,

Defendants – Appellants.

_____

APPEAL FROM JUNE 28, 2023 JUDGMENT AND OPINION AND ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO

_____

**ADDENDUM OF APPELLANTS' BRIEF**

## INDEX TO THE ADDENDUM OF APPELLANTS' BRIEF

| Document | Page Number |
|---|---|
| Opinion and Order Regarding Permanent Injunction, June 28, 2023………………………………………... | 001 – 024 |
| Judgment, June 28, 2023……………………………….. | 025-026 |
| Notice of Appeal, July 26, 2023……………………….. | 027-028 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

NORTHWESTERN SELECTA, INC.

      **Plaintiff**

        v.

SECRETARY OF THE DEPARTMENT
AGRICULTURE OF PUERTO RICO,
Ramón Gonzalez Beiró, and DEPUTY
SECRETARY OF THE DEPARTMENT OF
AGRICULTURE OF PUERTO RICO, Alex
Muñiz Lasalle.

      **Defendants**

**CIVIL NO.** 22-1092(RAM)

**OPINION AND ORDER REGARDING PERMANENT INJUNCTION**

RAÚL M. ARIAS-MARXUACH, United States District Judge

    Pending before the Court is Plaintiff Northwestern Selecta, Inc's ("Plaintiff" or "NWS") request for declaratory judgment and permanent injunction as articulated in its *Complaint for Declaratory Judgment and Preliminary and Permanent Injunction* and subsequent motions for emergency relief. (Docket Nos. 1, 35 and 46). For the following reasons, Plaintiff's request for a permanent injunction is **GRANTED**.

**I.    BACKGROUND**

    Plaintiff filed a *Verified Complaint* against the Secretary and Deputy Secretary of the Puerto Rico Department of Agriculture ("PRDA"), Ramón González-Beiró and Alex Muñiz-Lasalle, respectively ("Defendants"), seeking injunctive and declaratory

Civil No. 22-1092(RAM)                                                    2

relief from PRDA Market Regulation No. 8, registered with the
Puerto Rico Department of State as Regulation No. 8764, titled "To
Govern the Quality and Marketing of Poultry Meat in the
Commonwealth of Puerto Rico" ("Regulation No. 8" or "Regulation
No. 8764"). (Docket No. 1).

Plaintiff argues that Regulation No. 8, which purportedly
governs the quality and marketing of poultry meat in Puerto Rico,
is preempted by the Poultry Products Inspection Act ("PPIA"), 21
U.S.C. §§ 451-469, and the regulations promulgated thereunder by
the Food Safety and Inspection Service ("FSIS"). Id. ¶¶ 1, 28, 31.
NWS specifically challenges Articles XIV(A)(6) and XII(B) of
PRDA's Regulation No. 8 for imposing requirements "in addition to,
or different than" those established by the PPIA. Id. ¶ 31. Article
XIV(A)(6) prohibits imported poultry from being labeled as "Keep
Refrigerated or Frozen" despite the fact that FSIS regulation at
9 C.F.R. § 381.125(a) allows such labeling. Id. ¶¶ 32, 34.
Similarly, Plaintiff asserts that Article XII(B) imposes
additional "re-inspection" requirements beyond those established
by PPIA and FSIS regulations. Id. ¶ 48-56.

Pursuant to this Court's order at Docket No. 6, the parties
filed joint factual and document stipulations. (Docket No. 14-1).
Plaintiff filed a *Memorandum in Support of Request for Injunction*

Civil No. 22-1092(RAM)                                              3

and Defendants filed a brief in opposition. (Docket Nos. 23 and 24).

Subsequently, NWS filed the present *Motion Requesting Emergency Relief* notifying the Court that the PDRA detained over 40,000 lbs of poultry products for containing the label "Keep refrigerated or frozen". (Docket No. 35). Plaintiff asked the Court to issue the proposed permanent injunction as requested in the *Verified Complaint* or alternatively issue an order, *i.e.,* preliminary injunction, barring the PRDA from enforcing Regulation No. 8's provisions regarding the labeling and packaging of poultry products until the Court issues a ruling resolving the case. Id. ¶¶ 11-12.

On December 29, 2022, the Court granted a preliminary injunction barring the enforcement of PRDA, Article XIV(A)(6) labeling and marketing requirements. (Docket No. 41). The Court found that the prohibition of labeling "Keep refrigerated or frozen" was directly at odds with and preempted by the PPIA and the regulations issued. Id.

On January 31, 20223, Plaintiff subsequently filed a *Motion Requesting Emergency Relief* to extend the preliminary injunction to the PRDA's enforcement and implementation of Article XII(B). (Docket No. 46). Plaintiff informed the Court that the PRDA's

Civil No. 22-1092(RAM)                                              4

implementation of Article XII(B) has disrupted the orderly and timely operations of NWS. Id. at ¶¶ 12.

## II.  FINDINGS OF FACT

Having analyzed the relevant pleadings on the docket, and the stipulations filed by the parties, the Court makes the following findings of fact[1]:

1. The NWS facilities located at 769 Calle C, Mario Juliá Industrial Park, San Juan, Puerto Rico 00920 are certified as an "official establishment" by the United States Department of Agriculture. (Docket No. 14-1 ¶ 1).

2. NWS imports fresh and frozen poultry products domestically from the United States, as well as frozen poultry products from foreign countries. Id. ¶ 2.

3. Most NWS shipping containers containing poultry products also contain other food products. Id. ¶ 3.

4. All importers, including NWS, provide copies of bills of lading and inform the PRDA of the contents of the cargo shipping containers that arrive to the Port of San Juan. The bills of lading do not inform the PRDA of product conditions upon arrival. Only a visual inspection of the product shows the product condition upon arrival. All

---

[1] References to a specific Finding of Fact shall be cited in the following manner: (Fact ¶ _).

Civil No. 22-1092(RAM)                                                    5

poultry products that NWS imports from within the United States have already passed inspection on the mainland by the U.S. Department of Agriculture ("USDA") and bear an official mark to that effect. Id. ¶ 4.

5. PRDA detained fresh poultry products shipped from the United States by NWS bearing the label "Keep Refrigerated or Frozen" and did not allow NWS to distribute the products in Puerto Rico unless they were re-labeled with a label that reads "Keep Refrigerated" or "Keep Frozen." Id. ¶ 5.

6. On December 7, 2021, the PRDA Deputy Secretary, through its inspectors, issued several Orders of Detention impounding over 7,000 pounds of fresh poultry products at the NWS facilities which had been imported from the United States by NWS. The grounds for the Order of Detention were that the products were labeled as "Keep Refrigerated or Frozen" in violation of Article XIV(A)(6) of Regulation No. 8. Id. ¶ 6.

7. On June 30, 2021, the PRDA Deputy Secretary, through its inspectors, also issued several Orders of Detention, impounding over two hundred thousand (200,000) pounds of fresh poultry products imported by NWS from within the United States. The grounds for the Orders of Detention were that a PRDA inspector was not physically present when the

Civil No. 22-1092(RAM)                                                    6

shipping container containing the products was opened and unloaded at the NWS facilities, asserting a violation of Article XII(B) of Regulation No. 8. Id. ¶ 7.

8.  Since June 2021 and through March 2022, the PRDA Deputy Secretary has: (a) issued Notices of Violation against NWS with respect to thirty-five (35) shipping containers containing poultry products imported from within the U.S. that have been opened and unloaded at the NWS Facilities without the presence of a PRDA inspector, and (b) asserted the right to impose fines of approximately $263,000 against NWS. Id. ¶ 8.

9.  The Deputy Secretary would not rescind the Notices of Violation and continued to assert the right not to allow NWS to open and unload shipping containers containing poultry products imported from within the United States at the NWS facilities without the presence of a PRDA inspector. Id. ¶ 9.

10. The USDA and the FSIS do not require that a USDA-FSIS inspector be present when NWS opens and unloads shipping containers containing poultry products imported from within the United States at the NWS facilities. Id. ¶ 10.

Civil No. 22-1092(RAM)                                                    7

11. Prior to June 2021, PRDA had not enforced nor sought to enforce Article XII(B) of Regulation No. 8 against NWS. Id. ¶ 11.

12. On June 30, 2021, Agronomist Jaime Traverso visited the NWS facilities located in San Juan, Puerto Rico. At the moment of the visit, the containers subject to inspection had been opened and its contents unloaded. The PRDA issued Detention Orders 10395, 10396, 10397, 10398, 10399 and 10400. Id. ¶ 12.

13. On June 30, 2021, Alex Muñiz, acting as Deputy Secretary for Agro-Commercial Integrity, notified NWS that it had violated Regulation No. 8764, and the PRDA's intent to fine NWS with $500.00 fines for each violation. Id. ¶ 13.

14. On July 1, 2021, the PRDA rescinded the detention orders. The detained product entered commerce. Id. ¶ 14.

15. On July 20, 2021, NWS filed a motion to reconsider with the PRDA where Plaintiff argued, among other grounds, that Regulation No. 8764 was preempted by federal law and regulations. Id. ¶ 15.

16. On August 19, 2021, the PRDA vacated without prejudice the notices of violations. Id. ¶ 16.

Civil No. 22-1092(RAM)                                                    8

17. On August 30, 2021, the PRDA issued a notice of violation and an order to NWS to show cause why it should not be held in violation of Regulation No. 8764. Id. ¶ 17.

18. On September 14, 2021, NWS filed its motion showing cause where it argued, among other grounds, that Regulation No. 8764 was preempted by federal law and regulations. Id. ¶ 18.

19. On October 14, 2021, the PRDA issued a resolution and order that denied the motion showing cause and imposed the fines for each violation to Regulation No. 8764. Id. ¶ 19.

20. On November 15, 2021, NWS requested reconsideration with respect to the October 14, 2021 resolution and order, reiterating that the fines were preempted by federal law. Id. ¶ 20.

21. On January 10, 2022, the PRDA filed its answer to the administrative complaint. In it, PRDA asserted, among other things, that the administrative forum was "not the adequate forum" to resolve NWS's claims of federal preemption. Id. ¶ 21.

22. On January 20, 2022, the PRDA's examining officer issued an order slating an initial scheduling conference for February 2, 2022. Id. ¶ 22.

Civil No. 22-1092(RAM)                                                                 9

23. On February 2, 2022, an initial scheduling hearing was held. Id. ¶ 23.

24. On December 15, 2022, the PRDA issued an Order for Detention notifying NWS that the PRDA had detained 908 boxes of full chicken totaling 49,761.11 pounds for failing to comply with Regulation No. 8's labeling requirements because the chickens' individual packaging contained the terms "keep frozen or refrigerated." (Docket No. 30-1).

### III. APPLICABLE LAW

**A. Declaratory judgment**

The Declaratory Judgment Act ("DJA") provides that:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201.

The First Circuit has repeatedly explained that the DJA "neither imposes an unflagging duty upon the courts to decide declaratory judgment actions nor grants an entitlement to litigants to demand declaratory remedies. In other words, declaratory relief, both by its very nature and under the plain language of 28 U.S.C. § 2201, is discretionary." El Dia, Inc. v.

Civil No. 22-1092(RAM)                                              10

Hernandez Colon, 963 F.2d 488, 493 (1st Cir. 1992); *see also* Ernst

& Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 534 (1st

Cir. 1995).

   When exercising this discretion, courts must consider whether

a declaratory judgment will (1) "help clarify the legal questions

at issue[;]" and (2) "relieve the uncertainty or insecurity that

gave rise to the dispute" or otherwise "expedite resolution of the

underlying dispute." Metro. Prop. & Liab. Ins. Co. v. Kirkwood,

729 F.2d 61, 62 (1st Cir. 1984); *see also*, Cadillac Unif. & Linen

Supply, Inc. v. Cent. Gen. de Trabajadores, 2020 WL 4289389, at *6

(D.P.R. 2020), *report and recommendation adopted sub nom.* Cadillac

Uniforms & Linen Supply, Inc. v. Cent. Gen. de Trabajadores, 2020

WL 4289365, at *1 (D.P.R. 2020) (quotation omitted) (finding that

declaratory judgment is favored when it serves a useful purpose in

clarifying and settling the legal relations in issue and will

terminate and provide relief from the uncertainty, insecurity, and

controversy giving rise to the proceeding.").

### B. Preemption

   The Supremacy Clause of the United States Constitution states

that:

> This Constitution, and the Laws of the United
> States which shall be made in Pursuance
> thereof; and all Treaties made, or which shall
> be made, under the Authority of the United
> States, shall be the supreme Law of the Land;
> and the Judges in every State shall be bound

> thereby, any Thing in the Constitution or Laws
> of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2. By virtue of this clause, "the Constitution provides Congress with the power to pre-empt [sic] state law." Louisiana Pub. Serv. Comm'n v. F.C.C., 476 U.S. 355, 357 (1986). However, "[f]ederal law is presumed not to have preemptive effect, and that presumption is overcome 'only in the face of clear and contrary congressional intent.'" Siembra Finca Carmen, LLC. v. Sec'y of Dep't of Agric. of Puerto Rico, 437 F. Supp. 3d 119, 127 (D.P.R. 2020) (quoting Antilles Cement Corp. v. Fortuño, 670 F.3d 310, 323 (1st Cir. 2012). See also Florida Lime and Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142 (1963).

Congress may indicate its intent to preempt state law or regulations "through a statute's express language or through its structure and purpose." Altria Grp., Inc. v. Good, 555 U.S. 70, 76 (2008). Accordingly, a federal statute can preempt state law in one of three ways: (1) express preemption, whereby "congressional intent to preempt state law is made explicit in the language of a federal statute[;]" (2) field preemption, when "federal regulation in a legislative field is so pervasive that congressional intent allows no inference that it left room for the states to supplement it[;]" or (3) conflict preemption, which may arise "when it is impossible to comply with both federal and state law" or "when the state law stands as an obstacle to achieving the objectives of

federal law." <u>In re Allied Fin., Inc.</u>, 572 B.R. 45, 52-53 (Bankr. D.P.R. 2017) (citations omitted). *See also* <u>Siembra Finca Carmen, LLC.</u>, 437 F. Supp. 3d at 127-28.

**C. The PPIA and related federal regulations**

The general purpose of the PPIA is "to provide for the inspection of poultry and poultry products and to regulate their processing and distribution to prevent the movement or sale in interstate or foreign commerce of such products which are adulterated or misbranded." <u>Nw. Selecta, Inc. v. Munoz</u>, 106 F. Supp. 2d 223, 228 (D.P.R. 2000) (citing 21 U.S.C. § 452).

In its relevant part, the PPIA's preemption clause provides:

> **Requirements within the scope of this chapter with respect to premises, facilities and operations of any official establishment which are in addition to, or different than those made under this chapter may not be imposed by any State or Territory** or the District of Columbia, except that any such jurisdiction may impose recordkeeping and other requirements within the scope of paragraph (b) of section 460 of this title, if consistent therewith, with respect to any such establishment. **Marking, labeling,** packaging, or ingredient **requirements (or storage or handling requirements found by the Secretary to unduly interfere with the free flow of poultry products in commerce) in addition to, or different than, those made under this chapter may not be imposed by any State or Territory** or the District of Columbia **with respect to articles prepared at any official establishment** in accordance with the requirements under this chapter, **but any State or Territory** or the District of Columbia **may, consistent with the requirements under this**

**chapter exercise concurrent jurisdiction with the Secretary over articles required to be inspected under this chapter for the purpose of preventing the distribution for human food purposes of any such articles which are adulterated or misbranded** and are outside of such an establishment, or, in the case of imported articles which are not at such an establishment, after their entry into the United States. **This chapter shall not preclude any State or Territory or the District of Columbia from making requirement or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter.**

21 U.S.C. § 467e (emphasis added).

    i.   <u>Federal labeling regulations</u>

Chapter III Part 381 of Title IX of the Code of Federal Regulations contains the poultry products inspection regulations that implement the PPIA's provisions. Subpart N establishes labeling requirements for containers of poultry products. Containers for inspected and passed poultry products must bear legible labels on the principal display that contain the information as required and outlined by subpart N in great detail. *See* 9 C.F.R. § 381.116. Specifically, the labels must identify the name, class, and quantity of the product; any ingredients or additives; identification of the manufacturer, packer, or distributor; the official inspection legend and establishment number where the product was inspected; any specific dietary food properties; the applicable special handling label requirements;

Civil No. 22-1092(RAM)                                          14

and the packing and processing date. *See* 9 C.F.R. §§ 381.117-126.

Relevant to the case at bar, 9 C.F.R. § 381.125(a) provides:

> Packaged products which require special
> handling to maintain their wholesome condition
> shall have prominently displayed on the
> principal display panel of the label the
> statement: "Keep Refrigerated," "Keep
> Frozen," "**Keep Refrigerated or Frozen,**"
> "Perishable—Keep Under Refrigeration," or
> such similar statement as the Administrator
> may approve in specific cases. The immediate
> containers for products that are frozen during
> distribution and intended to be thawed prior
> to or during display for sale shall bear the
> statement "Shipped/Stored and Handled Frozen
> for Your Protection, Keep Refrigerated or
> Freeze."

In addition to identifying what information the labels must

include, the PPIA's accompanying regulations also dictates what

information is impermissible on a label. 9 C.F.R. § 381.129(a)

specifies that:

> No poultry product subject to the Act shall
> have any false or misleading labeling or any
> container that is so made, formed, or filled
> as to be misleading. However, established trade
> names and other labeling and containers which
> are not false or misleading and which are
> approved by the Administrator in the
> regulations or in specific cases are permitted.

§ 381.129(b) provides several examples of what constitutes

false or misleading statements, including:

> A raw poultry product whose internal
> temperature has ever been below 26 °F may not
> bear a label declaration of "fresh." A raw
> poultry product bearing a label declaration of
> "fresh" but whose internal temperature has
> ever been below 26 °F is mislabeled"

Civil No. 22-1092(RAM)                                          15

> . . .
>
> Raw poultry product whose internal temperature
> has ever been at or below 0°F must be labeled
> with the descriptive term "frozen," except
> when such labeling duplicates or conflicts
> with the labeling requirements in § 381.125 of
> this subchapter.

Id. § 381.129(b)(6)(i)-(ii).

It is also worth noting that labels can only be used once they have been submitted and approved by the FSIS or if they are one of the generically approved labels authorized by the regulations. *See* 9 C.F.R. §§ 412.1-2.

   ii.  <u>Federal inspection regulations</u>

The FSIS has established that "inspection of poultry products shall be rendered pursuant to the regulations and under such conditions and in accordance with such methods as may be prescribed or approved by the Administrator." 9 C.F.R. § 381.4. Under the PPIA as well as FSIS regulations, inspection is required at any establishment where poultry is slaughtered for transportation or sale in commerce, or in which any poultry products are wholly or in part processed for transportation or sale in commerce. 21 U.S.C. § 458(a)(2); 9 C.F.R. § § 381.6, 381.145.

**D. Puerto Rico Regulation No. 8**

   i.  <u>Article XIV labeling requirements</u>

Civil No. 22-1092(RAM)                                                    16

Article XIV of Regulation No. 8 specifies the labeling requirements for "[e]very container and wrapping used for the packing poultry meat that imported or marketed in Puerto Rico[.]" (Docket No. 1-6 at 29). Specifically, the label must contain "[t]he term 'maintain refrigerated,' if the product is fresh (26ºF to 36ºF)" or "[t]he term 'maintain frozen' if the product is frozen (0ºF to 10ºF)." Id. at 30; See Article XIV(A)(4)-(5). Article XIV(A)(6) provides that "[t]he terms 'maintain refrigerated' and 'maintain frozen' may not be used in the labeling of the same package." Id.

ii.   Article XII(B) inspection requirements

Article XII(A) of Regulation No. 8 provides that "[a]ll poultry meat that is imported to be marketed in Puerto Rico, will be inspected upon its arrival by an officer of the Department, to corroborate that the same meets the requirements required in this Regulation." Id. at 27. Moreover, Article XII(B) requires that "[a]n official of the [PRDA] must be present at the time of opening and unloading the container." Id.

**IV.  DISCUSSION**

NWS seeks declaratory judgment and injunctive relief on the basis that the PPIA preempts the PRDA's authority to impose distinct labeling and inspection requirements via Regulation No. 8. When a party "claims federal law immunizes [them] from state

Case: 23-1657    Document: 00118070398    Page: 59    Date Filed: 11/02/2023    Entry ID: 6601721
Case 3:22-cv-01092-RAM    Document 49    Filed 06/28/23    Page 17 of 24

Civil No. 22-1092(RAM)                                              17

regulation, the court may issue an injunction upon finding the state regulatory actions preempted." <u>Armstrong v. Exceptional Child Ctr., Inc.</u>, 575 U.S. 320, 326, 135 (2015) (citing <u>Ex parte Young</u>, 209 U.S. 123, 155-156 (1908)). Declaratory relief is proper in this case as it will clarify the legal questions in controversy and eliminate the uncertainty underlying the present dispute. *See* <u>Metro Prop. & Liab. Ins. Co.</u>, 729 F.2d at 62.

A party seeking permanent injunction must satisfy the following four-factor test:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

<u>Greene v. Ablon</u>, 794 F.3d 133, 156-57 (1st Cir. 2015) (quoting <u>CoxCom, Inc. v. Chaffee</u>, 536 F.3d 101, 112 (1st Cir. 2008)).

**A. Irreparable harm**

Both Article XIV(A) and XII(B) of Regulation No. 8 are preempted by the PPIA. The PPIA's preemption clause prohibits states and territories from imposing additional or distinct requirements with regards to "premises, facilities and operations of any official establishment" and "marking, labeling, packaging

or ingredient requirements (or storage or handling requirements found by the Secretary to unduly interfere with the free flow of poultry products in commerce)." 21 U.S.C. § 467e. It is uncontested that NWS is an "official establishment" for purposes of the PPIA.[2] (Fact ¶ 1). Therefore, the question the Court is tasked with unscrambling is whether Regulation No. 8's labeling and inspection requirements fall within the scope of this preemption clause.

When determining the substance and scope of an express pre-emption clause, courts must assume "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra, 870 F.3d 1140, 1146 (9th Cir. 2017) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)). Additionally, "[w]hen the text of an express pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" Altria Grp., Inc. v. Good, 555 U.S. 70, 77 (2008) (quoting Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449 (2005).

As discussed at length in the Court's previous Opinion and Order granting a preliminary injunction, Regulation No. 8's

---

[2] It is worth noting, however, that the PPIA most directly regulates "official establishments," where the "inspection of the slaughter of poultry, or the processing of poultry products," occurs. 21 U.S.C. § 453(p); see also 9 C.F.R. § 381. Neither slaughter or processing occurs at NWS facilities and, therefore, they are not the kind of establishments that Congress sought to regulate most directly.

Civil No. 22-1092(RAM)                                                            19

labeling provision is expressly preempted by the PPIA. (Docket No. 41 at 11-14). However, there is not a similar blanket preemption on all inspection requirements. The PPIA's preemption clause prohibits states and territories from imposing additional or distinct requirements with regards to "premises, facilities and operations of any official establishment" and "marking, labeling, packaging or ingredient requirements (or storage or handling requirements found by the Secretary to unduly interfere with the free flow of poultry products in commerce)." 21 U.S.C. § 467e.

Article XII(B) necessarily relates to NWS' operations, of which inspection is an integral part. Plaintiff asserts that compliance with this regulation affects distribution operations by causing delays and decreasing the shelf-life of imports, particularly when the PRDA inspector is untimely or fails to arrive completely.[3] (Docket No. 46 ¶ 5). Notably, other district courts have found that more remote regulations affect operations. *See, e.g.,* Johnson v. Tyson Foods, Inc., 2021 WL 5107723, at *6 (W.D. Tenn. 2021) (holding that "Tyson Foods' vaccination policy relates to its premises, facilities, and operations by ensuring that its employees are protected from COVID-19 infection; accordingly,

_____

[3] The absence of PRDA inspectors is not speculative, given the PRDA's Administrative Order 2022-14 issued on June 21, 2022, recognizing the lack of sufficient inspectors, and thus ordering aleatory inspections of imported products. (Docket No. 33-1 at 3-6).

Civil No. 22-1092(RAM)                                              20

Plaintiff's claims fall within the scope of the PPIA" and are thus
preempted).

The question thus becomes whether Article XII(B)'s inspection
requirement falls within the exception outlined by the PPIA's
preemption clause. As mentioned above, this clause also provides
that:

> any State or Territory or the District of
> Columbia **may, consistent with the requirements
> under this chapter exercise concurrent
> jurisdiction** with the Secretary **over articles
> required to be inspected under this chapter
> for the purpose of preventing the distribution**
> for human food purposes of **any such articles
> which are adulterated or misbranded and are
> outside of such an establishment,** or, in the
> case of imported articles which are not at
> such an establishment, after their entry into
> the United States.

21 U.S.C. § 467e (emphasis added). Per the plain language of this
section, the Commonwealth of Puerto Rico can exercise concurrent
jurisdiction with regards to inspection items thar are either (1)
adulterated or misbranded **and are outside of an official
establishment**; or (2) imported articles **that are not at an official
establishment** after their entry into the United States. Id. In
both instances, the products are *outside* of official
establishments. The poultry products imported by NWS **do not fall
under either of these two categories.** NWS facilities are an
official establishment that imports fresh and frozen poultry
products domestically from within the United States, as well as

frozen poultry products from foreign countries. (Fact ¶ 2). Therefore, the poultry products they import are necessarily *inside* an official establishment. Accordingly, the PRDA lacks concurrent jurisdiction to impose inspection requirements with regards to these products and Article XII(B) is preempted.

## B. Absence of adequate remedies

An integral element in issuing a permanent injunction is the unavailability, or at least inadequacy, of legal remedies. *See* In re Willis, 411 B.R. 783, 786 (Bankr. S.D. Fla. 2009). As NWS explained, the detainment of thousands of pounds of poultry significantly affects their operations which cannot be solved by monetary damages. Furthermore, the damage to NWS's reputation and products caused by a delay in inspection cannot be solved through other legal or financial remedies.

## C.  Balance of hardships

When balancing hardships courts must consider "the hardship that will befall the nonmovant if the injunctions issues . . . with the hardship that will befall the movant if the injunction does not issue." Mercado-Salinas v. Bart Enterprises Int'l, Ltd., 671 F.3d 12, 19 (1st Cir. 2011)). As the Court noted in its previous Opinion and Order, a government agency's interests cannot be harmed "by the inability to continue enforcing preempted laws." Siembra Finca Carmen, LLC., 437 F. Supp. 3d at 137. *See also* CTIA - The

Civil No. 22-1092(RAM)                                                    22

Wireless Ass'n v. Telecomm. Regul. Bd. of Puerto Rico, 2012 WL 12845587, *3 (D.P.R. 2012), *report and recommendation adopted* (quoting Legend Night Club v. Miller, 637 F.3d 291, 302-03 (4th Cir. 2011)) ("Generally, a state 'is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions.'"). By contrast, NWS faces irreparable harm. Therefore, the balance of hardships favors a permanent injunction.

### D. Public interest

The public interest which the fourth factor refers to is "the public interest in the issuance of *the injunction itself."* Braintree Labs., Inc. v. Citigroup Glob. Mkts, Inc., 622 F.3d 36, 45 n.8 (1st Cir. 2010)) (emphasis in original). When analyzing this factor, the Court looks towards "a fit (or lack of friction) between the injunction and the public interest." NuVasive, Inc. v. Day, 954 F.3d 439, 443 (1st Cir. 2020). "Just as a government has no interest in enforcing an unconstitutional law, the public interest is harmed by the enforcement of laws repugnant to the United States Constitution." Siembra Finca Carmen, LLC., 437 F. Supp. 3d at 137. Moreover, the public has a strong interest in avoiding shortages of key food items such as poultry products. Therefore, all four factors favor the issuance of a permanent

injunction barring the application of Article XIV(A)'s labeling requirements and Article XII(B)'s PRDA inspector requirement.

**V.   CONCLUSION**

In light of the above, Plaintiff's request for a Declaratory Judgment pursuant to 28 U.S.C. § 2201 and Permanent Injunction are **GRANTED.** The Court hereby **DECLARES** that Articles XII(B) and XIV(A)(6) of Puerto Rico Department of Agriculture Regulation No. 8764 (Market Regulation No. 8), are preempted by Section 467(e) of the Poultry Products Inspection Act ("PPIA"), 21 U.S.C. §§ 451-469.

Accordingly, the Court hereby **GRANTS** permanent injunctive relief and thus Defendants Ramón González-Beiró, Secretary of the Puerto Rico Department of Agriculture, and Alex Muñiz-Lasalle, the Deputy Secretary of the Puerto Rico Department of Agriculture, as well as their officers, agents, servants, employees, attorneys and any other persons who are in active concert or participation with them, are **hereby ENJOINED from:**

A.  Enforcing Articles XII(B) and XIV(A)(6) of Regulation No. 8 against Northwestern Selecta;

B.  Enforcing or giving effect to Article XIV(A)(6) of Regulation No. 8 that imposes requirements with respect to marking, labeling, packaging, or ingredients that are in addition to, or different than those made under the PPIA;

Civil No. 22-1092(RAM)                                                    24

C.  Enforcing or giving effect to Article XII(B) of Regulation No. 8 requiring that a PRDA inspector be physically present when shipping containers are opened and unloaded in official establishments; and

D.  Detaining imported poultry products or levying sanctions (including suspension or revocation of any license issued by the Puerto Rico Department of Agriculture, or failure to renew the same) against Northwestern Selecta for failure to comply with Articles XII(B) and/or XIV(A)(6) of Market Regulation No. 8.

This permanent injunction does not constitute a limitation on the PRDA's enforcement of Regulation No. 8 provisions that are identical to federal regulations.

Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 28th day of June 2023.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

NORTHWESTERN SELECTA, INC.

    **Plaintiff**

       v.

SECRETARY OF THE DEPARTMENT
AGRICULTURE OF PUERTO RICO,
Ramón Gonzalez Beiró, and DEPUTY
SECRETARY OF THE DEPARTMENT OF
AGRICULTURE OF PUERTO RICO, Alex
Muñiz Lasalle.

    **Defendants**

**CIVIL NO.** 22-1092(RAM)

**JUDGMENT**

In accordance with the Opinion and Order Regarding Permanent Injunction entered today at Docket No. 49, the Court hereby **DECLARES** that Articles XII(B) and XIV(A)(6) of Puerto Rico Department of Agriculture Regulation No. 8764 (Market Regulation No. 8), are preempted by Section 467(e) of the Poultry Products Inspection Act ("PPIA"), 21 U.S.C. §§ 451-469.

Accordingly, defendants Ramón González-Beiró, Secretary of the Puerto Rico Department of Agriculture, and Alex Muñiz-Lasalle, the Deputy Secretary of the Puerto Rico Department of Agriculture, as well as their officers, agents, servants, employees, attorneys and any other persons who are in active concert or participation with them, are **hereby ENJOINED from:**

A. Enforcing Articles XII(B) and XIV(A)(6) of Regulation No. 8 against Northwestern Selecta;

B. Enforcing or giving effect to Article XIV(A)(6) of Regulation No. 8 that imposes requirements with respect to marking, labeling, packaging, or ingredients that are in addition to, or different than those made under the PPIA;

C. Enforcing or giving effect to Article XII(B) of Regulation No. 8 requiring that a PRDA inspector be physically present when shipping containers are opened and unloaded in official establishments; and

D. Detaining imported poultry products or levying sanctions (including suspension or revocation of any license issued by the Puerto Rico Department of Agriculture, or failure to renew the same) against Northwestern Selecta for failure to comply with Articles XII(B) and/or XIV(A)(6) of Market Regulation No. 8.

This case is now closed for statistical purposes.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 28th day of June 2023.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| NORTHWESTERN SELECTA, INC. | Case No. 22-01092 (RAM) |
| Plaintiff, | |
| v. | |
| SECRETARY OF THE DEPARTMENT OF AGRICULTURE OF PUERTO RICO, Ramón González Beiró, and DEPUTY SECRETARY OF THE DEPARTMENT OF AGRICULTURE OF PUERTO RICO, Alex Muñiz Lasalle, | Complaint for Declaratory Judgment and Preliminary and Permanent Injunction |
| Defendants. | |

## <u>NOTICE OF APPEAL</u>

Notice is given that the Official Capacity Defendants, the Secretary of the Puerto Rico Department of Agriculture, and the Deputy Secretary of Puerto Rico Department of Agriculture, hereby appeal to the United States Court of Appeals for the First Circuit, from the Opinion and Order dated June 28, 2023 (Dkt. #49) and the Judgment dated June 28, 2023 (Dkt. #50).

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico this 26th of July, 2023.

**WE HEREBY CERTIFY** that of this date a true and exact copy of this motion has also been electronically filed with the Clerk of the Bankruptcy Court using the CM/ECF system which will send notification of such filing to all attorneys of record registered in the use of the CM/ECF system.

*Attorney for Official Capacity Defendants*
**THE LAW OFFICES OF**
**EDWARD W. HILL**
P.M.B 248
La Cumbre, 273 Sierra Morena
San Juan, P.R. 00926
Tel.:    (787) 294-0033
Fax:    (787) 294-8804


By:   s/ Edward W. Hill
Edward W. Hill
USDC-PR No. 213614