# United States Court of Appeals
## For the First Circuit

---

No. 23-1657

NORTHWESTERN SELECTA, INC.,

Plaintiff, Appellee,

v.

RAMÓN GONZÁLEZ-BEIRÓ, Secretary of the Puerto Rico Department of
Agriculture; ALEX MUÑIZ-LASALLE, Deputy Secretary of the Puerto
Rico Department of Agriculture

Defendants, Appellants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Raúl M. Arias-Marxuach, U.S. District Judge]

---

Before

Gelpí, Lipez, and Rikelman,
Circuit Judges.

---

Edward W. Hill Tollinche for appellants.

María D. Bertólez Elvira, with whom Néstor M. Méndez Gómez,
María Elena Martínez Casado, and Pietrantoni Méndez & Álvarez LLC
were on brief, for appellee.

---

July 17, 2025

---

**LIPEZ, <u>Circuit Judge</u>**.  The Poultry Products Inspection Act ("PPIA"), 21 U.S.C. §§ 451-473, provides for the inspection of poultry and poultry products that move through or substantially affect interstate or foreign commerce and regulates their processing and distribution.  Plaintiff Northwestern Selecta, Inc. ("NWS"), a Puerto Rico importer of poultry products, argues that the PPIA expressly preempts a regulatory provision promulgated by the Puerto Rico Department of Agriculture ("PRDA") -- Article XII(B) of Market Regulation No. 8 -- that requires a PRDA inspector to be present when a shipping container transporting poultry meat is opened and unloaded.  The district court agreed with NWS, determining that Article XII(B)'s inspector requirement falls within the scope of the PPIA's preemption clause and is not exempted by its savings clause.  The court therefore granted NWS declaratory relief and permanently enjoined the enforcement of Article XII(B) against it.  After careful consideration, we affirm.

I.

**A. The PPIA**

Enacted in 1957, the PPIA is a federal law that protects consumers by ensuring that the "poultry products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 451.  To that end, the PPIA "provide[s] for the inspection of poultry and poultry products and otherwise regulate[s] the[ir] processing and distribution."  <u>Id.</u> § 452.

- 2 -

Specifically, among other things, the PPIA authorizes the ante and postmortem inspection of poultry in designated "official establishments," id. § 455; mandates that "sanitary practices" shall apply to such establishments, see id. § 456; specifies labeling requirements for poultry products, see id. § 457; prohibits the sale, transportation, or receipt of adulterated, misbranded, or uninspected poultry products, id. § 458; and outlines the notification obligations of an official establishment "that believes, or has reason to believe, that an adulterated or misbranded poultry or poultry product received by or originating from the establishment has entered into commerce," id. § 459. In addition, the Food Safety Inspection Service ("FSIS") has been delegated the authority to promulgate further rules and regulations as necessary to implement the PPIA. See id. § 463(a)-(b); 9 C.F.R. § 300.2(a), (b)(2). Pursuant to that authority, the FSIS has promulgated hundreds of implementing regulations. See 9 C.F.R. §§ 381.1-381.524.

Of primary relevance here, the PPIA contains the following preemption provision, consisting of a preemption clause and a savings clause:

> Requirements within the scope of this chapter with respect to premises, facilities and operations of any official establishment which are in addition to, or different than those made under this chapter may not be imposed by any State or Territory or the District of Columbia . . . but any State or

- 3 -

> Territory or the District of Columbia may,
> consistent with the requirements under this
> chapter[,] exercise concurrent jurisdiction
> with the Secretary over articles required to
> be inspected under this chapter for the
> purpose of preventing the distribution for
> human food purposes of any such articles which
> are adulterated or misbranded and are outside
> of such an establishment . . . .

21 U.S.C. § 467e.

**B. Background[1]**

NWS is a San Juan-based company that brings fresh and frozen poultry products into Puerto Rico from the continental United States as well as from abroad.  The domestically transported poultry products, which are the focus of this appeal, are shipped by sea in large cargo containers and enter Puerto Rico via the Port of San Juan.  All poultry products that NWS brings to Puerto Rico from the mainland are inspected by the United States Department of Agriculture ("USDA") prior to transport and are given an "official mark" to that effect.

Upon arrival in Puerto Rico, the shipping containers are offloaded onto the Port's docks to await clearance by the appropriate authorities, including the PRDA.  NWS provides copies

---

[1] We draw the background facts from the parties' joint stipulations submitted to the district court. Accordingly, these facts are "binding and conclusive," and "the parties will not be permitted . . . to suggest, on appeal, that the facts were other than as stipulated." Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez, 561 U.S. 661, 677 (2010) (quoting 83 C.J.S. Stipulations § 93 (2000)).

of the shipments' bills of lading to inform the PRDA of the content of the containers that have arrived in the Port, although the bills of lading do not apprise the PRDA of the content's condition upon arrival.  Once the containers are cleared, a contractor hired by NWS transports them from the Port directly to NWS's nearby facility.  The containers are then opened and unloaded at the facility.

In June 2016, the PRDA promulgated Market Regulation No. 8, titled, "To Govern the Quality and the Marketing of Poultry Meat in the Commonwealth of Puerto Rico."[2]  The stated purpose of Regulation No. 8 is to prevent "illegal practices" and "protect the integrity in the quality and health of the local and imported products that are marketed in Puerto Rico."  To that end, Regulation No. 8 outlines various requirements regarding the transportation, storage, inspection, packaging, and labeling of poultry products brought into Puerto Rico.  The regulation also empowers the PRDA to detain any lot of poultry meat that does not meet the requirements set forth in the regulation, impose a fine on the importer for each violation of the regulation, and eventually, for repeated violations, revoke the importer's license. As pertinent to this appeal, Article XII(B) of Regulation

---

[2] Market Regulation No. 8 is registered with the Puerto Rico Department of State as Regulation No. 8764.

No. 8 provides that "[a]n official of the [PRDA] must be present at the time of opening and unloading the container" used to bring poultry products into Puerto Rico.

For about five years after Regulation No. 8 was promulgated, the PRDA did not enforce or seek to enforce Article XII(B) against NWS. Then, in June 2021, the PRDA issued several detention orders against NWS, impounding over 200,000 pounds of fresh poultry products transported by NWS from the continental United States. The corresponding violation notices explained that the orders were issued because a PRDA inspector was not physically present when the shipping containers used to transport the impounded products were "opened and unloaded at the NWS facilities" in violation of Article XII(B). Over the following months, the PRDA issued violation notices to NWS with respect to thirty-five shipping containers that were opened and unloaded outside the presence of a PRDA inspector and asserted the right to impose on NWS approximately $263,000 in fines.

## C. District Court Proceedings

Following an unsuccessful attempt to challenge the violation notices administratively pursuant to the procedures outlined in Regulation No. 8, NWS filed a verified complaint in federal court, asserting, among other things, that Article XII(B), as well as another provision of Regulation No. 8 pertaining to labeling -- Article XIV(A)(6) -- were expressly preempted by the

PPIA and the regulations promulgated thereunder, and requesting declaratory and injunctive relief.  After the PRDA submitted its answer to the complaint, NWS filed a memorandum in support of its request for injunctive relief and, a few months later, followed up with an emergency motion for a preliminary injunction barring the enforcement of Article XIV(A)(6) (the labeling provision) against it.  The district court granted that emergency motion.

Shortly thereafter, NWS filed another emergency motion to extend the preliminary injunction to Article XII(B) (the inspection provision), asserting that the PRDA's continued enforcement of that provision was disrupting NWS's orderly and timely operations.  The district court granted NWS's motion, declaring that the PPIA expressly preempts Article XII(B) and permanently enjoining its enforcement against NWS.[3]

In concluding that Article XII(B) is expressly preempted, the district court held that the Commonwealth provision "necessarily relates to NWS'[s] operations, of which inspection is an integral part."  Nw. Selecta, Inc. v. Sec'y of Dep't of Agric. of P.R., Civ. No. 22-01092, 2023 WL 4230446, at *8 (D.P.R. June 28, 2023).  Relying on the ordinary meaning of the term "operations," the district court credited NWS's assertion "that

_____

[3] The district court also granted declaratory and permanent injunctive relief on NWS's challenge to Article XIV(A)(6).  The PRDA did not appeal that ruling.

compliance with [Article XII(B)] affects distribution operations by causing delays and decreasing the shelf-life of imports, particularly when the PRDA inspector is untimely or fails to arrive completely" -- a likelihood that "is not speculative," given that the PRDA has explicitly "recogniz[ed] the lack of sufficient inspectors, and thus order[ed] aleatory inspections of imported products." Id. at *8 & n.3. The court also noted that other district courts have interpreted the PPIA's preemption clause expansively, finding that even "more remote regulations affect operations." Id. (citing Johnson v. Tyson Foods, Inc., No. 21-cv-01161, 2021 WL 5107723, at *6 (W.D. Tenn. Nov. 3, 2021) (holding, in denying the plaintiff's motion to remand, that the defendant raised a colorable federal defense because its COVID-19 "vaccination policy relates to its premises, facilities, and operations by ensuring that its employees are protected from COVID-19 infection")). Finally, the district court determined that the PPIA's savings clause does not exempt Article XII(B) from preemption because the Commonwealth provision does not apply to items located "outside of" NWS's facility. Id.

The sole issue on appeal is whether the PPIA expressly preempts Article XII(B). The PRDA maintains that the Commonwealth provision is not preempted, arguing that, in holding otherwise, the district court embraced too broad an understanding of the term "operations" in the PPIA's preemption clause and misapplied the

PPIA's savings clause. We review the district court's preemption determination -- a question of law -- de novo. See Medicaid & Medicare Advantage Prods. Ass'n of P.R., Inc. v. Emanuelli Hernández, 58 F.4th 5, 11 (1st Cir. 2023).

## II.

The Supremacy Clause of the United States Constitution makes federal law "the supreme Law of the Land," U.S. Const. art. VI, cl. 2, meaning "that Congress 'has the power to [preempt] state law,'" Medicaid & Medicare Advantage, 58 F.4th at 10 (quoting Me. Forest Prods. Council v. Cormier, 51 F.4th 1, 6 (1st Cir. 2022)). "The test for federal preemption of a Puerto Rico law is the same as the test under the Supremacy Clause for preemption of the law of a state." Id. at 10-11 (citing P.R. Dep't of Consumer Affs. v. Isla Petroleum Corp., 485 U.S. 495, 499 (1988)).

Federal preemption of a state or commonwealth law "may be either express or implied." Bower v. Egyptair Airlines Co., 731 F.3d 85, 92 (1st Cir. 2013). When a federal statute has an express preemption clause, "we do not invoke any presumption against [preemption]." Puerto Rico v. Franklin Cal. Tax-Free Tr., 579 U.S. 115, 125 (2016); see Medicaid & Medicare Advantage, 58 F.4th at 11-12 ("[T]he Supreme Court's broad language in Franklin forecloses us from applying the presumption against preemption in interpreting the [federal statute's] express preemption clause."). Instead, we use the usual tools of statutory interpretation,

- 9 -

"focus[ing] on the plain wording of the clause, which necessarily contains the best evidence of Congress'[s] preemptive intent." Chamber of Com. of U.S. v. Whiting, 563 U.S. 582, 594 (2011) (quoting CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993)); see also Franklin, 579 U.S. at 125 (explaining that resolving the scope of a preemption "provision begins 'with the language of the statute itself'" (quoting United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989))). After all, Congress's "intent 'is the ultimate touchstone' of an express preemption analysis." Medicaid & Medicare Advantage, 58 F.4th at 11 (quoting First Med. Health Plan, Inc. v. Vega-Ramos, 479 F.3d 46, 51 (1st Cir. 2007)). We also consider, secondarily, the preemption clause's statutory context and the statute's overall purpose. See Coventry Health Care of Mo., Inc. v. Nevils, 581 U.S. 87, 96 (2017) (noting, after considering the preemption clause's plain language, that "[t]he statutory context and purpose reinforce [the Court's] conclusion").

## A. The Preemption Clause

The first question before us is whether the PPIA's preemption clause -- i.e., the portion of the preemption provision that precedes the savings clause -- applies to Article XII(B). That clause consists of three distinct components. It provides for preemption when a state or commonwealth law or regulation imposes requirements (1) "with respect to premises, facilities and

operations"; (2) "of any official establishment"; that (3) "are in addition to, or different than those" established by the PPIA or its enabling regulations. 21 U.S.C. § 467e. The parties stipulate that the second element is satisfied here: NWS's facility has been deemed an "official establishment" by the Secretary of the USDA. They also stipulate that the PPIA does not require an inspector to be present when shipping containers are opened and unloaded. Because the PRDA does not explain, nor do we otherwise see, how a requirement that is absent from the PPIA is not "in addition to, or different than" the PPIA's requirements, we construe this stipulation as an acknowledgment that the third element is satisfied as well. Accordingly, to determine whether the preemption clause applies to Article XII(B)'s inspector requirement, we need to consider only whether that requirement is "with respect to premises, facilities and operations." Id.

NWS argues, as the district court found, that Article XII(B) functions "with respect to" NWS's "operations." We therefore begin by discerning the meaning of those terms. Because the PPIA does not define them, we look to the terms' ordinary meanings. See Sandifer v. U.S. Steel Corp., 571 U.S. 220, 227 (2014) ("It is a 'fundamental canon of statutory construction' that, 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.'" (quoting Perrin v. United States, 444 U.S. 37, 42 (1979))).

- 11 -

When the PPIA was enacted in 1957, "operations" was commonly understood to mean "the whole process of planning for and operating a business or other organized unit" or, relatedly, "a phase of a business or of business activity." Webster's New International Dictionary of the English Language 1581 (3d ed. 1961); see also Operation, Webster's New International Dictionary of the English Language 1707 (2d ed. 1950) ("Act of operating, or putting into or maintaining in, action; as, the operation of a machine, railroad, etc."). A modern dictionary similarly defines "operations" as "the activities involved in a company producing goods or delivering services." Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/operation [https://perma.cc/L3M9-B5RJ]. The term "with respect to" (or "respecting") is now, and was at the time of the PPIA's enactment, understood to mean "regarding" or "concerning." See Lamar, Archer & Cofrin, LLP v. Appling, 584 U.S. 709, 716 (2018) (citing Respecting, Random House Dictionary of the English Language 1221 (1st ed. 1966)); Respecting, Dictionary.com, https://www.dictionary.com/browse/respecting [https://perma.cc/Q8Y6-CU66] ("regarding; concerning"); see also In Respect of Something, Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/in-respect-of [https://perma.cc/H63W-5HMQ] ("in connection with something"). The definitions of these terms, separately and when

- 12 -

considered together, connote breadth.  See, e.g., Lamar, Archer &
Cofrin, LLP, 584 U.S. at 717 ("Use of the word 'respecting' in a
legal context generally has a broadening effect, ensuring that the
scope of a provision covers not only its subject but also matters
relating to that subject."); Nat'l Meat Ass'n v. Harris, 565 U.S.
452, 458-59 (2012) (observing that a preemption clause virtually
identical to the PPIA's "sweeps widely").

        The broad sweep of the language as understood in its
ordinary sense suggests that any requirement that impacts NWS's
operations would be within the scope of the preemption clause, and
it appears beyond debate that Article XII(B)'s requirement would
have such impact.  The PRDA contends, however, that we should not
base our preemption determination on the ordinary meaning of the
term "operations."  Specifically, the PRDA says that,
notwithstanding the term's plain, common meaning, the statutory
context as well as the PPIA's broader regulatory scheme make clear
that Congress intended for "operations" as used in the PPIA's
preemption clause to encompass only slaughtering and processing
activities.[4]  As support, the PRDA points to the PPIA's definition

---

        [4] The PRDA interchangeably frames this argument as regarding
the meaning of "operations" and as regarding the scope of the PPIA.
However, "[w]e see no real difference between saying that [Article
XII(B)] does not implicate 'operations'" within the meaning of the
PPIA "and saying that it does not fall within the scope of the
[PPIA].  Accordingly, our answer to both forms of the argument is
the same."  Nat'l Meat Ass'n, 565 U.S. at 465 n.8.

of an "official establishment," which is an establishment "at which inspection of the slaughter of poultry, or the processing of poultry products, is maintained" under the authority of the PPIA. 21 U.S.C. § 453(p); see also 9 C.F.R. § 381.1 (providing same definition). That definition, plus the references to slaughtering and processing in 21 U.S.C. § 456 and select regulatory provisions, the PRDA asserts, show that the PPIA "does not regulate matters . . . that do not implicate the slaughter or processing [of] poultry or poultry products." Unavoidably then, says the PRDA, a Commonwealth regulation that does not pertain to slaughtering or processing is not preempted.[5]

The PRDA's contention that the PPIA governs only "operations" relating to poultry slaughtering and processing is plainly unavailing. Most obviously, the statute's stated purpose encompasses matters beyond slaughtering and processing, such as regulating the "distribution of" poultry and poultry products, 21 U.S.C. § 452, and "assuring that poultry products distributed to [consumers] are wholesome, not adulterated, and properly marked, labeled, and packaged," id. § 451. Moreover, as described above,

---

[5] The PPIA defines "[p]rocessed" as "slaughtered, canned, salted, stuffed, rendered, boned, cut up, or otherwise manufactured or processed." 21 U.S.C. § 453(w); see also 9 C.F.R. § 381.1 (similar). "Slaughter" is defined as "the act of killing poultry for human food." 9 C.F.R. § 381.1. The parties agree that NWS does not engage in the slaughtering or processing of poultry meat within the meaning of the PPIA.

and as NWS emphasizes, the statute's provisions and implementing regulations cover an array of activities not pertaining to slaughtering and processing, from labeling and recordkeeping to sanitation and quality control.  See, e.g., id. §§ 456, 457, 460; 9 C.F.R. §§ 381.127, 381.145, 381.175.  While the PPIA and its implementing regulations focus heavily on the slaughtering and processing of poultry, those matters are simply not the statute's exclusive focus.  Thus, there is no basis for concluding that Congress intended to circumscribe the ordinary meaning of "operations" in the PPIA's preemption clause in the way that the PRDA suggests.[6]

The PRDA also argues that Article XII(B) "has no direct effect on the operations of" NWS, even if the term "operations" is construed according to its plain meaning.  In so arguing, the PRDA relies on the Supreme Court's decision in National Meat Association, where the Court was tasked with deciding whether the Federal Meat Inspection Act ("FMIA") -- which contains an express preemption clause that is "substantially identical" to the PPIA's, Grocery Mfrs. of Am., Inc. v. Gerace, 755 F.2d 993, 997 (2d Cir.

---

[6] To the extent that the PRDA argues that the PPIA does not apply to NWS because NWS does not meet the statutory definition of an "official establishment," that argument is a non-starter.  As noted above, the PRDA stipulated that NWS has been designated as an "official establishment" for purposes of the PPIA.  It cannot undo that factual stipulation via its arguments on appeal.  See Christian Legal Soc'y, 561 U.S. at 677.

1985) -- preempted a California statute that criminalized the buying, selling, receiving, butchering, and even holding of nonambulatory pigs (i.e., pigs that cannot walk).  See Nat'l Meat Ass'n, 565 U.S. at 455, 458-59.  In holding that the California statute was, indeed, preempted, the Court explained that the state law impermissibly "compels [slaughterhouses] to deal with nonambulatory pigs on their premises in ways that the [FMIA] and regulations do not." Id. at 460.  "And in so doing, the California law runs smack into the FMIA's regulations." Id. at 467.

The PRDA asserts that, unlike the state law at issue in National Meat Association, Article XII(B) does not "reach[] into" NWS's facilities or "affect[] its daily activities." Id.  While the California statute "told the slaughterhouse what it could and could not do inside of its premises, facilities and in its operation," says the PRDA, Article XII(B) "does nothing to affect the inner workings of" NWS.  Specifically, the PRDA asserts that Article XII(B) "does not regulate the conditions under which [NWS] can process, receive, handle, package or market meat." Any effect Article XII(B) may have on NWS's operations is merely "incidental," the PRDA avers, in contrast to the California law's direct effect on slaughterhouses.

This argument, too, falls flat.  For one, the PRDA's insistence that Congress did not intend for the PPIA to preempt state or commonwealth laws or regulations that have an "incidental"

effect on the operations of an official establishment is undermined by the statute's text.  As we have explained, Congress's use of the expansive phrase "with respect to" in the PPIA's preemption clause signals congressional intent for the clause to cover all "matters relating to" an official establishment's operations.  See Lamar, Archer & Cofrin, LLP, 584 U.S. at 717.  Given the preemption clause's wide sweep, see Nat'l Meat Ass'n, 565 U.S. at 459, we see no basis for concluding that the PPIA could not preempt a Commonwealth regulation that incidentally affects NWS's operations.

Moreover, even if we were to so conclude, Article XII(B) does precisely what the PRDA says it does not.  By forbidding NWS from opening shipping containers outside the presence of a PRDA inspector -- i.e., telling NWS what it can and cannot do -- Article XII(B) expressly "regulate[s] the conditions under which" NWS can "receive" and "handle" the poultry products it brings into Puerto Rico.  Further, as described above, the district court credited NWS's assertion that compliance with Article XII(B) "affects distribution operations by causing delays and decreasing the shelf-life of imports," thereby unavoidably impacting NWS's daily activities.  Nw. Selecta, 2023 WL 4230446, at *8.  The PRDA points to no facts suggesting that this finding was erroneous.  Thus, far from "incidental," Article XII(B), like the California law in

- 17 -

National Meat Association, directly impacts NWS's ability to operate its business.

Finally, the PRDA argues that the term "operations" in the PPIA's preemption clause is limited by the accompanying terms "premises" and "facilities" such that a state or commonwealth regulation can be preempted only if it concerns an official establishment's onsite operations -- i.e., those occurring at its premises or facilities -- citing the Seventh Circuit's decision in Chicago-Midwest Meat Association v. City of Evanston, 589 F.2d 278 (7th Cir. 1978).[7] Article XII(B), the PRDA contends, does not have the requisite onsite impact. NWS responds that the PRDA did not argue before the district court that the PPIA preempts only state or commonwealth regulations that concern onsite operations and thus has waived this argument.

---

[7] In Chicago-Midwest Meat Association, the plaintiffs argued that a municipal ordinance permitting the inspection of meat delivery vehicles was preempted by the Wholesome Meat Act, a 1967 amendment to the FMIA. Chi.-Midwest Meat Ass'n, 589 F.2d at 280. Based on the preemption clause's language and the statute's legislative history, the Seventh Circuit interpreted the phrase "premises, facilities and operations" to mean that only requirements concerning operations "on the premises of the regulated establishments" could be preempted. Id. at 283-84. Because the ordinance at issue authorized the inspection of delivery vehicles "while on their delivery routes" and thus "away from" the regulated establishments, the court held that the ordinance was not "with respect to premises, facilities and operations" and therefore was not preempted. Id.

- 18 -

However, we need not delve into the waiver issue because the PRDA's argument clearly fails as a factual matter.  Although it now purports to argue otherwise, the PRDA stipulated in the district court that NWS's shipping containers are "opened and unloaded at the NWS facilities." (Emphasis added).  The PRDA may not contradict its stipulations in the district court and contend on appeal that Article XII(B)'s inspector requirement somehow functions "away from" NWS's facility.  See Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez, 561 U.S. 661, 677 (2010).  Also, the various violation notices that the PRDA issued explain that NWS violated Article XII(B) because NWS's shipping containers were "opened and unloaded at the facilities" without a PRDA inspector present. (Emphasis added.) The PRDA likewise cannot disassociate itself from these representations on appeal.

In sum, the PPIA's preemption clause broadly covers state and commonwealth regulations "with respect to" the procedures and activities involved in the operation of an official establishment.  Article XII(B)'s application to NWS falls within that scope.  Accordingly, we hold that Article XII(B) is expressly preempted by the PPIA's preemption clause.

## B. The Savings Clause

The second question before us is whether Article XII(B) is exempted from preemption by the preemption provision's savings

- 19 -

clause, which provides that any state or territory "may, consistent with the requirements under [the PPIA,] exercise concurrent jurisdiction . . . over articles required to be inspected under" the PPIA to "prevent[] the distribution for human food purposes of any such articles which are adulterated or misbranded and are outside of . . . an [official] establishment." 21 U.S.C. § 467e. Once again, our interpretation of this clause is grounded in its plain language.  See Franklin, 579 U.S. at 125.

The district court read the plain language of the savings clause as limiting the Commonwealth's exercise of concurrent jurisdiction to the regulation of poultry "products [that] are outside of official establishments." Nw. Selecta, 2023 WL 4230446, at *8.  Because it determined that the poultry products that NWS brings into Puerto Rico "are necessarily inside an official establishment" -- NWS's facility -- when the products' containers are opened and unloaded, the district court held that Article XII(B), as applied to NWS, is not a proper exercise of concurrent jurisdiction.  Id.

We agree with the district court's interpretation of the savings clause to the extent that the court read the clause as permitting the Commonwealth to impose some requirements on poultry products that are outside of an official establishment.  21 U.S.C. § 467e.  Indeed, the PRDA does not challenge this reading, arguing instead that the district court erred in concluding that Article

XII(B), as applied to NWS, does not function outside of NWS's facility -- that is, in concluding that the "container is inside or part of [NWS's] official establishment" when it is opened and unloaded.    The PRDA again relies on Chicago-Midwest Meat Association, asserting that the delivery truck inspection ordinance at issue there, which the Seventh Circuit determined was not preempted, is analogous to Article XII(B)'s inspector requirement.    See 589 F.2d at 283.    Again, though, the PRDA's argument misses the mark because, as explained above, the stipulated facts distinguish this case from Chicago-Midwest Meat Association.

However, to the extent that the district court read the savings clause as prohibiting the Commonwealth from exercising concurrent jurisdiction inside of an official establishment under any circumstances, we disagree.  The savings clause simply provides that "outside of . . . an [official] establishment" a state or commonwealth may exercise concurrent jurisdiction to "prevent[] the distribution for human food purposes of any" articles subject to the PPIA's inspection requirements "which are adulterated or misbranded." 21 U.S.C. § 467e.  In other words, the savings clause clarifies that a state or commonwealth retains its traditional police powers over articles subject to federal inspection once those articles have left an official establishment.  Inside of an official establishment, a state or commonwealth may exercise its

- 21 -

authority so long as that exercise complies with the preemption clause -- that is, so long as the state or commonwealth is not imposing additional or different requirements than those contained in the PPIA.  See Bates v. Dow Agrosciences LLC, 544 U.S. 431, 447 (2005) (concluding that a preemption provision barring state-law requirements "in addition to or different from" federal requirements does not interfere with an "equivalent" and "fully consistent" state requirement).  Because Article XII(B)'s inspector requirement is not equivalent to the PPIA's requirements, as we have explained, Article XII(B) is not a permissible exercise of the Commonwealth's authority.

But, consistent with the preemption provision, the Commonwealth would be free to "exact civil or criminal penalties for . . . conduct that also violates the [PPIA]."  Nat'l Meat Ass'n, 565 U.S. at 467 n.10; see also Kuenzig v. Kraft Foods, Inc., No. 8:11-cv-838-T-24, 2011 WL 4031141, at *4 (M.D. Fla. Sept. 12, 2011) ("The states' concurrent jurisdiction has been interpreted to mean that states can impose sanctions for violations of state requirements that are equivalent to the FMIA and the PPIA's requirements.").  So, for example, we see no reason why the PRDA could not permissibly promulgate a regulation permitting its inspectors, inside of the official establishment, to take samples of poultry products that NWS brings into Puerto Rico after the containers transporting those products are opened because such an

- 22 -

exercise of authority would be consistent with the PPIA. <u>See</u> 9 C.F.R. § 381.146 (permitting inspectors to "take . . . such samples as are necessary of any poultry product . . . at any official establishment to determine whether it complies with the requirements of the regulations").[8] Thus, while the PPIA "preempts much state law," it certainly "leaves some room for the [s]tates to regulate." <u>Nat'l Meat Ass'n</u>, 565 U.S. at 467 n.10.

Accordingly, we hold that the savings clause does not exempt Article XII(B) from preemption. We therefore <u>affirm</u> the judgment of the district court.

<u>So ordered.</u>

---

[8] At oral argument, counsel for NWS explained that the PRDA does, in fact, regularly exercise its concurrent jurisdiction inside of NWS's establishment by taking samples of the poultry products that NWS brings into Puerto Rico and that NWS has no objection to that conduct.